**Bruce H. TUCHMAN, John Hastings, Sheldon Shore, and Dorothy Curran on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**DSC COMMUNICATIONS CORP., James L. Donald, Gunnar J. Korpinen, Frank J. Perpiglia, David M. Holland, Gerald F. Montry and Kenneth R. Vines, Defendants.**

No. 3:91–CV–1366–X.

United States District Court,
N.D. Texas,
Dallas Division.

March 16, 1993.

Wilmer Dallam Masterson, III, Kilgore & Kilgore, Dallas, TX, Stanley R. Wolfe, Berger & Montague, Philadelphia, PA, Jules Brody, Stull Stull & Brody, Samuel P. Sporn, Schoengold & Sporn, New York City, Bruce H. Tuchman.

Wilmer Dallam Masterson, III, Kilgore & Kilgore, Dallas, TX, for John Hastings, Sheldon Shore, Dorothy Curran.

E. Russell Nunnally, Sally Christine Helppie, Johnson & Gibbs, Dallas, TX, Michael J. Chepiga, Nancy Mallory, Simpson Thacher & Bartlett, New York City, for DSC Communications Corp., James L. Donald, Frank J. Perpiglia, Gunnar J. Korpinen.

E. Russell Nunnally, Sally Christine Helppie, Johnson & Gibbs, Dallas, TX, for David M. Holland, Gerald F. Montry, Kenneth R. Vines.

## ORDER OF DISMISSAL

KENDALL, District Judge.

Before the court are:

1. Defendants' Motion to Dismiss the Complaint, filed February 3, 1992;
2. Plaintiffs' Memorandum of Law in Opposition, filed March 24, 1992;
3. Defendants' Reply, filed April 23, 1992; and
4. Plaintiffs' Motion to Certify Class Action, filed April 21, 1992.

For the reasons set forth below, the court concludes that Plaintiffs have failed to state a claim of securities fraud so that Defendants' Motion to Dismiss the Complaint is GRANTED and all of Plaintiffs' causes of action against Defendants are DISMISSED without prejudice. Plaintiffs' Motion to Certify Class Action is therefore DENIED AS MOOT.

## BACKGROUND

This consolidated class action complaint was filed by purchasers of common stock of Defendant DSC Communications Corporation (DSC) between February 7, 1991 and October 30, 1991 (the class period). DSC designs, manufactures, markets, and services telecommunications switching systems, digital cross-connect systems, intelligent network systems, and other products for domestic and international long distance telephone companies, local exchange carriers, and private network customers. Complaint ¶ 9. The individual defendants are directors and senior managers of DSC. Complaint ¶¶ 11–17.

One of DSC's principal products is the MegaHub Signal Transfer Point (STP), a high-capacity switch that acts as the hub for signal switching in the Common Channel Signalling System (CCS7) network, using packet

switched digital network technology to route telephone calls faster and increase the capabilities of transmission facilities. Complaint ¶ 38. The MegaHub STP is used by five of the seven regional Bell holding companies—Bell Atlantic, Pacific Telesis, Ameritech, Southwestern Bell, and US West. Complaint ¶¶ 57, 58. In March 1991, DSC shipped new software to its Bell customers, which was installed in April and May 1991. Complaint ¶ 58.

On June 10, 1991, Pacific Bell (a subsidiary of Pacific Telesis) experienced telephone signaling-network trouble in Los Angeles. On June 26, 1991, Pacific Bell and Bell Atlantic's Chesapeake & Potomac unit both experienced extended telephone network outages that shut down most local calling in Los Angeles, Washington, Maryland, Virginia, and West Virginia. On July 1 and 2, Bell Atlantic experienced a network failure in western Pennsylvania. Also on July 1, Pacific Bell's San Francisco-area signaling system began to shut down as well. Each of these Bell companies was using slightly different versions of the software designed and sold to them by DSC. Complaint ¶ 59.

Within days of the outages, hearings were held by Congress to investigate the cause of the outages. Defendant Perpiglia, DSC's vice-president of corporate planning, testified on behalf of DSC before the House Subcommittee on Telecommunications and Finance on July 9, 1991 and before the House Subcommittee on Government Information, Justice and Agriculture on July 10, 1991. Complaint ¶ 62. Perpiglia candidly admitted that the DSC equipment was "a contributor to the disruptions" and that it had been a mistake not to put the software modifications through the rigorous 13-week test that DSC typically performs before shipping a software product to its customers. Complaint ¶ 67.

One day later, on July 11, 1991, Plaintiff Tuchman filed a class action securities fraud complaint on behalf of all shareholders who had purchased DSC stock between February 7, 1991 (the date of DSC's 1990 Annual Report) and July 9, 1991. Subsequent lawsuits filed within the next few days were consolidated into this action, and Plaintiffs amended their Complaint in December 1991 to enlarge the class period through October 30, 1991. Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rules and regulations promulgated thereunder by the Securities and Exchange Commission (SEC), including Rule 10b–5, 17 C.F.R. 140.10b–5. Plaintiffs also allege state law causes of action for common law fraud and negligent misrepresentation. Defendants move to dismiss the Complaint pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity and Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief can be granted. Defendants also move to dismiss Plaintiffs' state law claims for lack of pendent jurisdiction.

## STANDARD FOR DISMISSAL

■ A complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In reviewing a Rule 12(b)(6) motion, the court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The facts pled in the plaintiff's complaint, however, must be specific and not merely conclusory. *Elliott v. Perez,* 751 F.2d 1472, 1479 (5th Cir.1985). Conclusory allegations and unwarranted deductions of fact are not admitted as true by a motion to dismiss. *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992).

## DISCUSSION

As a threshold matter, the court excludes from consideration all matters presented outside the pleadings, so that the Defendants' motion remains a motion to dismiss, and is not converted to a motion for summary judgment. FED.R.CIV.P. 12(b). Plaintiffs allege that during the class period Defendants made numerous optimistic statements about DSC's operations and future in the telecom-

munications industry, when in actuality, the company was experiencing quality control and other problems. The type of statements challenged by Plaintiffs as materially false and misleading include:

DSC is at the forefront of the fastest-growing segments of the telecommunications industry. We are addressing our chosen markets with leading-edge technology and a total commitment to quality.

As a leading supplier of telecommunications equipment, we have earned a reputation for listening to our customers and swiftly responding with the products and services they require.

We have traditionally done well in understanding customer needs and are now putting greater emphasis on such elements as designing to cost goals, manufacturability and quality. . . .

The significant investments which we have made in product development in recent years have placed us at the forefront of the fastest-growing segments of the telecommunications industry and position us for long-term success.

The foundation of Plaintiffs' Complaint is set forth in paragraph 25, in which Plaintiffs assert a series of premises:

(a) DSC was experiencing increasing pressures from its competitors and its competitive position in the industry was rapidly declining, necessitating drastic price cuts and resulting in declining sales of its products, declining gross margins and losses;

(b) DSC had an unfavorable product mix and was severely lagging in innovation and product development in a complex industry in which rapid technological advancement and product innovation are essential to maintain profitability and growth;

(c) Customers were not delaying purchasing decisions, but were in fact cancelling orders for, returning DSC products and/or maintaining or even increasing their purchasing levels of comparable equipment— but from vendors other than DSC;

(d) DSC materially overstated assets, including inventory and receivables, and income. Material amounts of inventory represented cancelled orders, and returned, obsolete and/or defective products which were nevertheless carried on the Company's books and reported at inflated values. The massive write-downs of inventory and receivables for the 1991 third quarter should have been disclosed and reported in the Company's financial statements for prior periods;

(e) DSC's software, including its intelligent network system software, hardware, hardware components (including printed circuit boards), switches, and expansions, were insufficiently tested before being marketed, released and shipped to its customers and contained material manufacturing, design and operational defects, including defects known to the Company prior to shipment;

(f) DSC's software, including intelligent network system software, could not be relied upon to perform the complex routing and other telecommunications tasks which customers (and the investment community) were told it could perform;

(g) DSC sacrificed manufacturing quality and failed adequately to test its hardware equipment and software because of its overriding desire to "rush to market" with its products to get a jump on its competitors;

(h) The consequences of (e), (f), and (g), above, including massive telephone disruptions and outages, cancellations of orders by customers, returns of equipment, loss of business to DSC's competitors, and resultant revenue and income declines, were contingencies known to, foreseen by and/or recklessly disregarded by DSC and would place, and in fact did place, DSC in noncompliance with certain financial covenants under its senior loan agreements, including its bank revolving credit agreement and other senior borrowings, rendering it unable to make the interest payments on its 7¾% convertible debentures, and causing a lowering of its debenture ratings by ratings agencies. This in turn accelerated customer defections to DSC's competitors because of concerns as to DSC's ability to obtain financing for its continued operations; and

(i) Such weaknesses as DSC did report with respect to its then current and future revenue, margins, and earnings were not due to general "economic conditions", "economic uncertainties" or any "delay" in customer purchase decisions occasioned thereby. Nor were they merely temporary. Rather, they were long-term problems caused by DSC's individual business, marketing, financial, and operations deficiencies which to date have led to the substantial $25.7 million loss the Company reported for its 1991 second quarter, and the staggering $78.8 million loss reported for its 1991 third quarter.

Plaintiffs then compare statements made in DSC's 1990 annual report and SEC form 10–K, DSC's 1991 First Quarter Report to shareholders and SEC form 10–Q, DSC's 1991 Second Quarter Report to shareholders and SEC form 10–Q, and various DSC press releases, to the premises declared in paragraph 25, claiming that Defendants' statements were false and misleading statements of material fact, and also that these documents and press releases omitted material facts, creating a fraud on the market for DSC stock.

*Securities Fraud Claims Against DSC*

▮ To state a claim under § 10(b) and Rule 10b–5, plaintiffs must allege specific facts to establish 1) a misstatement or an omission 2) of material fact 3) made with scienter 4) on which the plaintiff relied 5) that proximately caused his injury. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *aff'd in part, rev'd in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Longden v. Sunderman,* 737 F.Supp. 968, 975 (N.D.Tex.1990). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976).

▮ The court concludes that Plaintiffs have failed to state a securities fraud claim. Conspicuously absent from the complaint are the necessary facts to establish that any misstatements or omissions which may have been made were made with scienter. The Complaint lacks any facts from which fraudulent intent can reasonably be inferred. While scienter may be demonstrated by inference, this "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990). Plaintiffs' assertions of intent are simply insufficient:

> Defendants committed the fraudulent acts, practices, and course of conduct, as hereinabove alleged, for the purposes of creating an artificially inflated picture of DSC's financial and operating condition, increasing the Company's market share and gaining competitive advantage, maintaining an artificially inflated price for the common stock, preserving defendants' position, perquisites and emoluments of office, securing, maintaining and/or increasing competition for themselves, and/or inflating the value of their shares and options for shares of DSC.

Complaint ¶ 103. These are not facts, but are conclusory allegations as to motive. Defendants sold none of their DSC shares during the class period, so that an inference of insider trading is unwarranted. As one court has noted, "incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." *Ferber v. The Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn. Dec. 2, 1991). The court concludes that Plaintiffs have failed to state a claim for securities fraud.

▮ Defendants also assert that Plaintiffs have failed to plead fraud with particularity. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R.CIV.P. 9(b). The requirements of Rule 9(b) apply to securities fraud claims. *Smith v. Ayres,* 845 F.2d 1360, 1365 (5th Cir.1988); *Whalen v. Carter,* 954 F.2d 1087, 1097 (5th Cir.1992). Conclusory allegations of securi-

ties fraud are insufficient to avoid dismissal. *Whalen* at 1098. The purposes of Rule 9(b) are: 1) to ensure that the plaintiff has investigated and reasonably believes a fraud has occurred; 2) to provide adequate notice to defendants so that they can respond to the plaintiff's claims; and 3) to protect the reputation of defendants. *Guidry v. Bank of LaPlace*, 740 F.Supp. 1208, 1216 (E.D.La. 1990), *aff'd in part and modified in part*, 954 F.2d 278 (5th Cir.1992); *Kronfeld v. First Jersey Nat'l Bank*, 638 F.Supp. 1454, 1463 (D.N.J.1986). An additional purpose of Rule 9(b) is to preclude litigants from filing baseless complaints and then attempting to discover unknown wrongs. *Guidry*, 740 F.Supp. at 1216; *D & G Enter. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 574 F.Supp. 263, 266 (N.D.Ill.1983).

The court concludes that Plaintiffs have failed to state their securities fraud claim with particularity as required by Rule 9(b). The premises stated in paragraph 25 of the complaint are just that—premises, not facts. They are the Plaintiffs' opinions and conclusions concerning events and business circumstances in 1991. The court agrees that the twenty statements pulled out of context by Plaintiffs from Defendants' SEC filings and press releases could give rise to liability under the securities law, provided that Plaintiffs could adequately plead facts indicating that the statements were materially misleading. Plaintiffs have failed to offer "provable facts" that support an inference of fraud. *See Kowal v. MCI Communications Corp.*, No. 90–2862 JGP, 1992 WL 121378 (D.D.C. May 20, 1992). As the court noted in *Heller v. NCNB Corp.*, 768 F.Supp. 167 (W.D.N.C. 1991), "[t]he complaint basically recites a series of financial reports, press releases and other information available to the public and then alleges that these were all false and misleading and were made with knowledge or reckless disregard of their false nature or misleading qualities. The complaint falls far short of providing an adequate factual basis for an inference of fraud and scienter." *Heller* at 169.

A few examples from the Complaint illustrate the court's conclusion. Plaintiffs assert that "DSC was experiencing increasing pressures from its competitors and its competitive position in the industry was rapidly declining, necessitating drastic price cuts and resulting in declining sales of its products, declining gross margins and losses." Complaint ¶ 25(a). What was DSC's position in relation to its competitors? Prices were cut for which DSC products? Plaintiffs assert that "DSC had an unfavorable product mix and was severely lagging in innovation and product development in a complex industry in which rapid technological advancement and product innovation are essential to maintain profitability and growth." Complaint ¶ 25(b). What was DSC's product mix? Why was it unfavorable? What data substantiates the conclusion that DSC was severely lagging in innovation and product development? Plaintiffs assert that, after the Bell outages, "customer defections to DSC's competitors began to increase markedly, resulting in large-scale cancellation of orders, returns of equipment, and a fall-off in new orders." Complaint ¶ 71. Plaintiffs fail to provide any facts to support these assertions. How many customers defected? Which customers? Which orders were cancelled? What equipment was returned? What figures demonstrate a fall-off in new orders? Plaintiffs' inability to distinguish facts from mere opinions and conclusions renders the Complaint insufficient to satisfy the particularity requirements of Rule 9(b).

*Securities Fraud Claims Against the Individual Defendants*

Plaintiffs allege that defendants "employed a scheme and conspiracy to defraud, as a part of which said defendants made, participated in the making of, or aided and abetted the making of the misrepresentations of fact as set forth hereinabove ..." Complaint ¶ 108. General allegations, which do not state with particularity what representations each defendant made, do not meet the particularity requirement. *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986). A claim that a defendant aided and abetted a violation of Rule 10b–5 requires that the plaintiffs allege, at the very least, that a securities violation occurred, that the defendant was generally aware of his participation in improper activity, and that the defendant rendered substantial and knowing

assistance. *Smith v. Ayres* at 1365. Liability as an abettor does not attach where the assistance amounted to "no more than transactions constituting the daily grist of the mill." *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975).

The court concludes that Plaintiffs have failed to plead with particularity the allegations against the individual defendants. Plaintiffs state that:

> Each defendant herein is sued individually, as a co-conspirator with other defendants, and as an aider and abettor of the violations of law committed by the other defendants. The liability of each defendant arises from the fact that each engaged in either all or part of the unlawful acts, plans, schemes, transactions, artifices to defraud and other violations alleged herein.

Complaint ¶ 18. Although some of the challenged statements were made by Defendants Donald and Perpiglia, the other four individual defendants are not mentioned except to identify their titles and areas of responsibility, and some irrelevant descriptions of their DSC stock ownership and compensation. The court holds that Plaintiffs have wholly failed to meet the Rule 9(b) particularity requirement with respect to the individual defendants.

*State Law Claims*

 As for Plaintiffs' pendent state law claims, the court notes that the Supreme Court has emphasized that the power of the district court to hear pendent state claims is discretionary. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). District courts are to decide whether to retain jurisdiction in cases where there are pendent state claims, but the underlying federal claims have been dismissed, based on considerations of judicial economy, convenience, fairness, and comity. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *Guidry,* 954 F.2d at 285. In a case in which all federal law claims are eliminated before trial, the balance of factors to be considered will point toward declining to exercise jurisdiction over the remaining state law claims. *Carnegie–Mellon* at 350 n. 7, 108 S.Ct. at 619 n. 7. Based on these considerations, the court declines to exercise jurisdiction over the pendent state claims remaining in this case.

*Venue*

 Finally, the court notes that venue for this case is improper in this district. Plaintiffs plead in their amended Complaint that "Defendant DSC's principal place of business is in this District," Complaint ¶ 3, and that "Defendant DSC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Plano, Texas," Complaint ¶ 9. Plano is in Collin County, which is in the Sherman division of the Eastern District of Texas and not the Northern District of Texas.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss the Complaint is GRANTED and all of Plaintiffs' causes of action against Defendants are DISMISSED without prejudice, and Plaintiffs' Motion to Certify Class Action is DENIED AS MOOT.

SO ORDERED.