United States Court of Appeals,

Fifth Circuit.

No. 93-1328.

Bruce H. TUCHMAN, On Behalf of Himself and All Others Similarly Situated, et al., Plaintiffs-Appellants,

v.

DSC COMMUNICATIONS CORPORATION, et al., Defendants-Appellees.

Feb. 25, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG and JOLLY, Circuit Judges.[*]

GOLDBERG, Circuit Judge:

In this appeal, we must determine whether the district court properly dismissed the appellants' securities fraud claims against DSC Communications Corporation ("DSC") and several other individual defendants. The district court dismissed the appellants' claims without prejudice. 818 F.Supp. 971. The court first held that the appellants' federal securities fraud claims failed to state a claim upon which relief could be granted because the complaint did not adequately allege scienter. The court also concluded that the appellants failed to plead their federal securities fraud claims with sufficient particularity. Having dismissed the federal claims, the district court then denied a pending motion for class certification as moot and declined to exercise jurisdiction over the supplemental state law claims. After a careful review of the complaint, we affirm the judgment of the district court.

I. Facts and Proceedings Below

DSC is a publicly held corporation, with approximately 41 million shares of stock outstanding. The company designs, manufactures, markets, and services advanced telecommunications switching systems and other products for domestic and international long distance telephone companies, local exchange carriers, and private network customers. One of DSC's principal products is the MegaHub Signal Transfer Point ("STP"). The MegaHub STP is an integral part of a high-capacity telephone

[*]Judge Barksdale heard oral argument in this case, but disqualified himself before the decision was entered. Accordingly, this case is decided by a quorum. *See* 28 U.S.C. § 46(d).

call routing and switching system used by five of the seven regional Bell telephone companies:  Bell Atlantic, Pacific Telesis, Ameritech, Southwestern Bell, and U.S. West.

In March of 1991, DSC shipped upgraded software for the MegaHub STP to its Bell customers.  In April and May of that year, these companies installed the upgraded software.  On June 10, 1991, Pacific Bell (a subsidiary of Pacific Telesis) experienced severe local telephone service disruptions in Los Angeles.  On June 26, Pacific Bell and Bell Atlantic suffered extended telephone network system failures that shut down most local telephone service in Los Angeles, the District of Columbia, Maryland, Virginia, and West Virginia.  On July 1 and 2, Bell Atlantic experienced a similar network failure in western Pennsylvania.  On July 1, Pacific Bell's San Francisco-area signalling system began to shut down as well.  In each instance, the afflicted companies were using their newly installed DSC software.

Within days, Congress decided to investigate the causes of these system failures.  Frank Perpiglia, DSC's vice president of corporate planning, testified before the House Subcommittee on Telecommunications and Finance on July 9, 1991 and before the House Subcommittee on Government Information, Justice, and Agriculture on July 10, 1991.  Perpiglia candidly acknowledged that DSC equipment had been a contributor to the telephone service outages.  He also allowed that it had been a mistake to deliver to DSC's Bell customers the upgraded software for the MegaHub STP without putting it through the 13-week test that DSC typically performs before delivering new software products to its customers.

On July 11, 1991, only one day after Perpiglia completed his testimony before Congress, appellant Bruce Tuchman filed a class action securities fraud complaint against DSC and several individual defendants.[1]  Tuchman sought to represent the class of all shareholders who purchased DSC stock between February 7, 1991—the date of DSC's 1990 Annual Report—and July 9, 1991.

---

[1]The individual defendants are James L. Donald, chairman of the board, chief executive officer, and president of DSC;  Gunnar J. Korpinen, senior vice president of DSC's Technology Group until May of 1991;  Frank F. Perpiglia, DSC's vice president of corporate planning until May of 1991 when he assumed many of Korpinen's duties;  David M. Holland, DSC's senior vice president for North American sales and marketing;  Gerald F. Montry, DSC's senior vice president and chief financial officer;  and Kenneth R. Vines, DSC's vice president and controller.

Several other strikingly similar complaints were filed within the next few days.  These suits were consolidated with Tuchman's suit.  A consolidated class action complaint was then filed, amending the appellants' previous complaints and extending the class period to October 30, 1991—the day before DSC announced its third quarter results for 1991.[2]  The consolidated complaint alleged that the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[3]  This complaint also raised state common law fraud and negligent misrepresentation claims.

The consolidated complaint, despite its length, is not a model of specificity.  Pleaded almost entirely on information and belief, it states that the defendants made "proud and optimistic portrayal[s] of DSC's current and projected business, marketing, technological and financial achievements" despite the fact that DSC was "badly lagging behind its competitors in terms of new product development, product quality, cost containment, and product sales."  The plaintiffs charge that the defendants thus contrived a "scheme to foster the illusion that DSC was in the forefront of the industry in terms of product quality and innovation, had the ability to meet the demands of its

---

[2]DSC announced losses of $25.7 million on revenues of $116.9 million for the second quarter of 1991 and losses of $78.8 million on revenues of $97.6 million for the third quarter of 1991.

[3]Section 10(b) makes it unlawful for any person

> [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 provides, in pertinent part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

customers in the rapidly changing technological environment, would continue to attract business, generate substantial revenues and positive earnings, would at least maintain, if not increase, gross profit margins, and would be able to attract sufficient financing to maintain and develop a competitive product line."

To carry out this alleged scheme, the plaintiffs claim that the defendants portrayed DSC to the public as "an industry leader in research and development, product innovation, manufacturing and marketing of sophisticated telecommunications switching equipment and systems of the highest quality, efficiency, and reliability, and as enjoying wide and growing customer acceptance of and satisfaction with its products." The plaintiffs also assert that the defendants depicted DSC "as being financially sound, having substantial assets (including inventory and receivables), and expecting long-term growth in its revenues, gross profit margins, earnings, and market share, while characterizing disappointing results and/or unfulfilled expectations in those areas as being merely temporary, and resulting primarily from general "current economic conditions', "economic uncertainties', and, more particularly, "delays' in its customers' purchasing decisions."

The plaintiffs charge that these statements were materially false or misleading (or omitted to state material facts necessary to render them not false or misleading) because:

(a) DSC was experiencing increasing pressures from its competitors and its competitive position in the industry was rapidly declining, necessitating drastic price cuts and resulting in declining sales of its products, declining gross margins and losses;

(b) DSC had an unfavorable product mix and was severely lagging in innovation and product development in a complex industry in which rapid technological advancement and product innovation are essential to maintain profitability and growth;

(c) Customers were not delaying purchasing decisions, but were in fact cancelling orders for, returning DSC products and/or maintaining or even increasing their purchasing levels of comparable equipment—but from vendors other than DSC;

(d) DSC materially overstated assets, including inventory and receivables, and income. Material amounts of inventory represented cancelled orders, and returned, obsolete and/or defective products which were nevertheless carried on the Company's books and reported at inflated values. The massive write-downs of inventory and receivables for the 1991 third quarter should have been disclosed and reported in the Company's financial statements for prior periods;

(e) DSC's software, including its intelligent network system software, hardware, hardware components (including printed circuit boards), switches, and expansions, were insufficiently tested before being marketed, released and shipped to its customers and contained material

manufacturing, design and operational defects, including defects known to the Company prior to shipment;

(f) DSC's software, including intelligent network systems software, could not be relied upon to perform the complex routing and other telecommunications tasks which customers (and the investment community) were told that it could perform;

(g) DSC sacrificed manufacturing quality and failed adequately to test its hardware equipment and software because of its overriding desire to "rush to market" with its products to get a jump on its competitors;

(h) The consequences of (e), (f) and (g), above, including massive telephone disruptions and outages, associated costs of the disruptions and outages, cancellations of orders by customers, returns of equipment, loss of business to DSC's competitors, and resultant revenue and income declines, were contingencies known to, foreseen by and/or recklessly disregarded by DSC and would place, and in fact did place, DSC in non-compliance with certain financial covenants under its senior loan agreements, including its bank revolving credit agreement and other senior borrowings, rendering it unable to make the interest payments due on its 73/47 convertible debentures, and causing a lowering of its debenture ratings by ratings agencies. This in turn accelerated customer defections to DSC's competitors because of concerns as to DSC's ability to obtain financing for its continued operations;  and

(i) Such weaknesses as DSC did report with respect to its then current and future revenue, margins, and earnings were not due to general "economic conditions", "economic uncertainties" or any "delay" in customer purchase decisions occasioned thereby.  Nor were they merely temporary.  Rather, they were long-term problems caused by DSC's individual business, marketing, financial, and operational deficiencies which to date have led to the substantial $25.7 million loss the Company reported for its 1991 second quarter, and the staggering $78.8 million loss reported for its 1991 third quarter.

Consolidated Complaint ¶ 25.

The remainder of the consolidated complaint compares statements culled from DSC's public statements to the allegations contained in paragraph 25.  The complaint concludes that DSC's public disclosures included misstatements and omissions of material facts.  These alleged misstatements and omissions fall into three general categories:  (1) the quality, reliability, and competitiveness of DSC and its products;  (2) DSC's marketing position and growth prospects;  and (3) DSC's financial position.  A few examples from each category will suffice.[4]

Regarding DSC's assertions of quality, the plaintiffs charge that DSC President James Donald made a material misstatement of fact when he wrote in his letter to shareholders that was included in DSC's 1990 annual report that DSC had a "total commitment to quality."  According to the

---

[4]Other allegations in the consolidated complaint simply quote from DSC's public statements and conclusorily assert that they are false or misleading.  Such allegations fall far short of adequately pleading securities fraud.

plaintiffs, the fact that DSC's MegaHub STP was involved in the telephone outages of the summer of 1991 and the fact that the upgraded software for the MegaHub STP was not tested as rigorously as completely new products generally are shows that Donald's assurances of quality were false or misleading. The plaintiffs also assert that the defendants' fraudulent conduct is demonstrated by their false and contradictory statements regarding DSC's responsibility for the telephone service failures.

As to DSC's marketing position and growth prospects, the plaintiffs maintain that the following excerpt from DSC's 1990 annual report is materially false and misleading: "The company continued to be profitable, but not to the level that was originally planned. This was due to a number of factors, including the impact of current economic conditions, which led to the delay of certain customer purchase decisions.... We expect these factors are only temporary obstacles to our continued profitable growth." The plaintiffs assert that DSC economic downturn was in fact caused by the company's unfavorable product mix and a loss of competitiveness.

Finally, regarding DSC's financial position, the plaintiffs charge that the defendants misrepresented or concealed the reasons for and potential effects of a re-negotiated agreement between DSC and Motorola, an agreement that DSC labeled a "particular success". The plaintiffs also charge that the defendants misrepresented or concealed the reasons for and potential effects of DSC's increased inventory levels.

After the consolidated complaint was filed, the defendants moved to dismiss the plaintiffs' claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief can be granted and under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity. The district court granted the defendants' motion on both grounds: The court first concluded that the plaintiffs had failed to state claim upon which relief could be granted because they had not pleaded any facts "to establish that any misstatements or omissions which may have been made were made with scienter." 818 F.Supp. at 976. The court also found that the plaintiffs had "failed to state their securities fraud claim with particularity." *Id.* at 977. The district court then denied a pending motion for class certification, declined to exercise jurisdiction over the remaining state law claims, and dismissed the plaintiffs' claims without prejudice. Contending that their securities fraud claims were adequately pleaded,

plaintiffs appeal.

## II. Discussion

The plaintiffs' consolidated complaint contains three basic sets of claims: federal securities fraud claims, state common law fraud claims, and state common law negligent misrepresentation claims. The district court dismissed the federal securities fraud claims and declined to exercise jurisdiction over the remaining state law claims. We now examine the district court's dismissal of the plaintiffs' federal securities fraud claims.[5]

To establish a federal securities fraud claim under § 10(b) of the Securities Exchange Act and Rule 10b-5, the plaintiffs must show "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury." *Cyrak v. Lemon,* 919 F.2d 320, 325 (5th Cir.1990); *Schlesinger v. Herzog,* 2 F.3d 135, 139 (5th Cir.1993).

Scienter is a crucial element of the securities fraud claims in this case. Scienter must be shown because not every misstatement or omission in a corporation's disclosures gives rise to a Rule 10b-5 claim. The Supreme Court has defined scienter to be "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). We have held that the scienter element of a federal securities fraud claim may be satisfied by

> proof that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993) (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961-62 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)); *Akin v. Q-L Invest. Inc.,* 959 F.2d 521, 526 n. 2. (5th Cir.1992). As we shall show below, it was necessary that the plaintiffs adequately plead scienter to survive a motion to dismiss.

---

[5]Since there was no class certification, we treat this case as one brought by the named plaintiffs individually. *Kaplan v. Utilicorp United, Inc.,* 9 F.3d 405, 407 (5th Cir.1993).

We review the dismissal of the plaintiffs' federal securities fraud claims on the pleadings *de novo,* employing the same standard as the district court. *Shushany,* 992 F.2d at 520. Accordingly, we will accept as true the well-pleaded factual allegations of the consolidated complaint and any reasonable inferences to be drawn from them. *Id.* In order to avoid dismissal for failure to state a claim, however, " "a plaintiff must plead specific facts, not mere conclusory allegations....' " *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992) (citation omitted). We will thus not accept as true conclusory allegations or unwarranted deductions of fact.

Typically, a plaintiff's complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In other words, a plaintiff must simply allege all of the elements of a right to recover against a defendant. To prevail on a motion to dismiss an ordinary claim under Fed.R.Civ.P. 12(b)(6), a defendant must show that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, the first sentence of Federal Rule of Civil Procedure 9(b) imposes a heightened level of pleading for fraud claims: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This requirement applies to federal securities fraud claims. *Whalen v. Carter,* 954 F.2d 1087, 1097 (5th Cir.1992). In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Shushany,* 992 F.2d at 521; *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

The particularity demanded by Rule 9(b) necessarily differs with the facts of each case. *Guidry,* 954 F.2d at 288. Thus, it is not especially useful to "articulate[ ] the requirements of Rule 9(b) in great detail." *Id.* Nevertheless, we have recently stated that Rule 9(b) requires the plaintiff to allege "the particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.' " *Tel-Phonic Services, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992) (citation omitted).

Importantly, though, the second sentence of Rule 9(b) relaxes the particularity requirement for conditions of the mind, such as scienter: "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Although scienter may be "averred generally", case law amply demonstrates that pleading scienter requires more than a simple allegation that a defendant had fraudulent intent. To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud. *See Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's "knowledge' of material falsity, unless the complaint *also* sets forth specific facts that makes it reasonable to believe that defendant knew that a statement was materially false or misleading.") (emphasis in original); *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.) ("Although Rule 9(b) does not require "particularity' with respect to the defendants' mental state, the complaint must still afford a basis for believing that plaintiffs could prove scienter."), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *cf. Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (requiring plaintiffs who allege fraud "to plead the factual basis which gives rise to a '*strong inference* ' of fraudulent intent.") (citation omitted) (emphasis added).

The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show a defendant's motive to commit securities fraud. Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner,* 902 F.2d at 172.

Our review of the allegations contained in the consolidated complaint leads us to the

inescapable conclusion that the district court properly dismissed the plaintiffs' securities fraud claims.

In support of their claims that the defendants acted with scienter, the plaintiffs do not allege that the defendants purchased or sold any stock during the class period. The only allegation regarding the defendants' motivation is the contention that the defendants acted

> for the purpose of creating an artificially inflated picture of DSC's financial and operating condition, increasing the Company's market share and gaining competitive advantage, maintaining an artificially inflated price for the common stock[,] ... preserving defendants' positions, perquisites and emoluments of office, securing, maintaining and/or increasing compensation for themselves, and/or inflating the value of their shares and options for shares of DSC.

Consolidated Complaint ¶ 103. This allegation alone does not set out facts sufficient to lead to a proper inference of scienter. As the court below aptly noted:

> "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."

818 F.Supp. at 976 (quoting *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn.1991)).

Since the defendants' motive to commit securities fraud is not readily apparent, the plaintiffs face a more stringent standard for establishing fraudulent intent. *Beck,* 820 F.2d at 50. The plaintiffs cannot meet this standard. The plaintiffs first cite several allegedly contradictory statements made by the defendants. The plaintiffs' principal example of fraud is the contrast between (1) James Donald's statements regarding DSC's "total commitment to quality," and (2) Frank Perpiglia's testimony to Congress that the upgraded software for the MegaHub STP shipped to Bell customers in the spring of 1991 had not been tested as rigorously as most DSC products were tested. These allegations, however, do not suffice to allege scienter. The plaintiffs have conspicuously failed to allege any facts that show that Donald's statements were belied by his actual knowledge of contradictory facts. Without such a showing, this segment of the consolidated complaint fails to state a claim for securities fraud.

Similarly, the plaintiffs' charge that Donald and Perpiglia made contradictory statements from one day to the next regarding (1) DSC's responsibility for the telephone network outages and (2) the adequacy of DSC's testing of the software involved in those outages is insufficient to establish

securities fraud.[6]  Regarding both alleged contradictions, the complaint contains no assertion of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made.  Again, without such a showing, this portion of the consolidated complaint fails to state a claim for securities fraud.

The plaintiffs have also alleged that the defendants gave a false or misleading explanation for the downturn in DSC's sales in 1991, gave a false positive characterization of a re-negotiated contract with Motorola, and falsely overstated the reasons for and value of DSC's inventory.  These allegations too fail to adequately establish a securities fraud claim.

Conspicuously absent from the plaintiffs' allegations related to the re-negotiated Motorola contract is any statement that the defendants concealed or misrepresented material information relating to that agreement.  Although DSC characterized the Motorola contract as a "particular success", the defendants were under no duty to "employ the adjectorial characterization" that the plaintiffs believe is more accurate.  *Wright v. International Business Machines Corp.,* 796 F.Supp. 1120, 1126 (N.D.Ill.1992).  The plaintiffs' allegations concerning the Motorola contract do not state a claim for securities fraud.

Similarly, the plaintiffs have not set forth sufficient facts to show that the defendants' statements that the downturn in DSC's business was due in part to "economic uncertainties" and "current economic conditions" were made with knowledge that they were false or misleading.  The

---

[6]It is far from clear that DSC's public statements regarding its responsibility for the telephone outages are contradictory.  A comparison of the statements that the plaintiffs claim to be contradictory illustrates this point.  DSC's alleged denial of responsibility is in fact a model of equivocation, reservation, and uncertainty.  DSC stated:

> Although a significant multi-company effort has already been expended in investigating the causes of several recent telephone network disruptions, many of the important questions have not been answered.  While it is clear that DSC systems were involved in the outages, this is a highly complex network involving hundreds of network elements, and it is unlikely that there is an underlying root cause for the disruptions.

In his testimony to Congress, defendant Perpiglia candidly admitted DSC's involvement.  He stated that DSC's "equipment was without question a contributor to the disruptions."  It is not clear to us that there is a contradiction between these two statements.  Nevertheless, as we explain in the text, merely contrasting these two statements in a complaint is insufficient to plead securities fraud.

plaintiffs' contention that the defendants knew that these statements were false and misleading because the defendants knew that DSC was experiencing increased competition and had an unfavorable product mix are insufficient to establish a claim for securities fraud. The plaintiffs' allegations on this count are nothing more than conclusory disparaging characterizations of DSC's products and market position. Finally, the plaintiffs have failed to plead adequately any facts which show that the defendants' knew that their statements regarding the valuation of DSC's inventory were materially false or misleading when made.

The plaintiffs' complaint recites various episodes and acknowledgements of corporate mismanagement and failings of quality control. These failings led to, among other things, the embarrassing and highly publicized disruptions of telephone service in the summer of 1991 and a resultant decline in the price of DSC stock. However, corporate mismanagement does not, standing alone, give rise to a 10b-5 claim, and mea culpa does not sufficiently satisfy the scienter requirements of pleading in securities fraud cases unless it is shown to relate to activities that have a definable nexus or relationship with the sale or purchase of a security. In closing, we should all be reminded of Judge Mukasey's cogent observation that:

> [t]he securities laws do not put executives of public corporations to the choice of either hiding their mistakes or facing a class-action shareholder suit. In fact, the "fundamental purpose" of the securities laws is just the opposite—"to substitute a philosophy of full disclosure for the policy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

*Hershfang v. Citicorp,* 767 F.Supp. 1251 (S.D.N.Y.1991) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). The district court properly concluded that the plaintiffs failed to adequately plead a 10b-5 claim.

Since the plaintiffs failed to properly allege a violation of the federal securities laws, the plaintiffs' claims against DSC and the individuals defendants were correctly dismissed. Moreover, the district court plainly did not abuse its discretion when it declined to exercise its discretionary jurisdiction over the supplemental state law claims. 28 U.S.C. § 1367(c)(3); *Parker & Parsley Petroleum Co. v. Dresser Indus.,* 972 F.2d 580 (5th Cir.1992).

III. Conclusion

The judgment of the district court is AFFIRMED.

. . . . .