**Coleman MILLER, Edward Bishop and James Johnson, Plaintiffs,**

v.

**TALTON TELECOMMUNICATIONS CORPORATION, Defendant.**

**Civ. A. No. 3:93–CV–311WS.**

United States District Court, S.D. Mississippi, Jackson Division.

Sept. 25, 1995.

Louise Harrell, Jackson, MS, for plaintiffs.

Richard C. Bradley, III, Stennett, Wilkinson & Ward, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before this court is defendant's motion for summary judgment pursuant to Rule 56(b),[1] Federal Rules of Civil Procedure. Defendant Talton Telecommunications Corporation (hereinafter "Talton") contends in its motion that it is entitled as a matter of law to judgment in its favor on plaintiffs' breach of contract claim. Plaintiffs Coleman Miller, Edward Bishop and James Johnson filed this breach of contract action on June 28, 1993, against the defendant Talton herein alleging that Talton had breached its contract with plaintiffs and refused to pay them just compensation for plaintiffs' efforts in helping defendant to secure a prison inmate coinless telephone service contract with the State of Mississippi for the Southeast Mississippi Correctional Facility, located in Leakesville, Greene County, Mississippi. In their motion, defendants deny any breach of contract, arguing instead that the undisputed facts and the plain wording of their contract with

---

1. Rule 56(b) of the Federal Rules of Civil Procedure provides:

   (b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

plaintiffs show that their successful grant of the service contract with the State of Mississippi to service the Southeast Mississippi Correctional Facility was totally beyond the scope of their written agreement with plaintiffs. This court has studied the parameters of the contract between the parties in issue and is persuaded by defendant's argument. Accordingly, for the reasons which follow, this court grants summary judgment to the defendant.

### PARTIES AND JURISDICTION

Plaintiffs Coleman Miller, Edward Bishop and James Johnson, are adult resident citizens of Mississippi. Defendant Talton is an Alabama Corporation doing business in Mississippi.

Plaintiffs originally filed this action in the Circuit Court of Hinds County, Mississippi, First Judicial District, as a breach of contract action against Talton for the recovery of Eight Million Dollars ($8,000,000) in damages, plus interest and all court costs. Upon proper petition of defendant, this cause was removed from state court to this court pursuant to Title 28 U.S.C. § 1332,[2] inasmuch as this is a controversy wholly between citizens of different states, and the amount in controversy exceeds the sum or value of Fifty Thousand Dollars ($50,000), exclusive of interest and costs. Of course, since this court's basis of jurisdiction is diversity-of-citizenship and since all of the events forming the background of this suit occurred in Mississippi, this court is obliged to apply Mississippi's substantive law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (in federal courts, except in matters governed by the Federal Constitution or acts of Congress, the law to be applied in any case is the law of the forum state); *Boardman v. United Services Auto. Association*, 742 F.2d 847, 849 (5th Cir.1984); *Mitchell v. Craft*, 211 So.2d 509, 516 (Miss. 1968) (Mississippi's choice-of-law rules directs its courts to apply a center of gravity test).

**2.** Title 28 U.S.C. § 1332 provides in pertinent part:

    (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—

        (1) citizens of different States; ...

### UNDISPUTED FACTS

The Mississippi Department of Corrections operates correctional facilities at Parchman, Rankin County and Greene County and 17 community work centers located throughout the state. Prior to 1992, South Central Bell Telephone Company provided via contract the local telephone service at the State's correctional facilities within South Central Bell's service area which included Parchman, the Rankin County facility and many of the various community work centers located throughout Mississippi. The Southeast Mississippi Correctional Facility was outside the South Central Bell service area. The local telephone carrier in that area decided that it did not want to provide inmate telephone services to the Southeast Mississippi Correctional Facility.

In 1992, the Mississippi Public Service Commission conducted hearings on providing coinless telecommunication services to inmates of correctional facilities in Mississippi. The Commission was to consider whether to terminate the existing contracts with South Central Bell and award a master contract to a private bidder to provide inmate telephone service at all of the state correctional facilities, including service to the Southeast Mississippi Correctional Facility.

During this time, specifically in April 1992, plaintiffs Coleman Miller, Edward Bishop and James Johnson and defendant Talton came into contact with each other. They soon discovered that they had mutual and, possibly, advantageous financial interests. Talton yearned for the master contract with the State of Mississippi. Plaintiffs desired a satisfactory measure of compensation for the expertise and political contacts they could expend in an endeavor to help a company such as Talton win the State bid. So, after a few rounds of discussions, a marriage of purposes occurred and the parties entered into a written contract. The contract obligated plaintiffs to deliver "an acceptable 5 year contract to provide exclusive inmate pay tele-

phone service for the State of Mississippi Penal institutions" in return for specified compensation. The contract also contained the following provision:

> In the event you (i.e., the plaintiffs) are not successful in securing this contract, it is understood we (i.e., Talton Telecommunications Corporation) will not be liable to you for securing any contract directly on our behalf.

On June 24, 1992, Talton Communications, among other interested parties, was notified via letter by the Mississippi Central Data Processing Authority (CDPA), the entity handling the bidding process, that CDPA had decided to keep its existing contracts with South Central Bell intact and offer for bid only the inmate telephone system at the Southeast Mississippi Correctional Facility.

Thereafter, on June 15, 1992, Julius E. Talton, Sr., president of Talton, sent a letter to plaintiff Coleman Miller telling him that the deal was off. Referring to the CDPA letter, Talton stated that the CDPA letter "pretty much tells what is going to happen as prison telephones are concerned in Mississippi for the next couple of years." Talton added:

> Therefore, it appears our agreement entered into on April 21, 1992, becomes moot. It is important to point out to you that part of our letter of understanding stating Talton Telecommunications might proceed to secure prison business in the event you were not successful in securing the master prison contract. The letter from Mr. Stebbins [executive director of CDPA] also states they are preparing bid specifications for an inmate telephone system for the Southeast Mississippi Correctional Facility located in Greene County. We, of course, will proceed on our own to bid this job when we receive the specs from the Central Data Processing Authority.

In January, 1993, the CDPA awarded Talton Communications the contract for the inmate telephone system at the Southeast Mississippi Correctional Facility. Once learning of Talton's successful bid, plaintiffs demanded compensation for the out-of-pocket expenses and expertise they claim they expended in educating Talton on the appropriate

successful course of action and contacting key State officials to smooth Talton's efforts. Talton turned a deaf ear, pointed to the parties' contract and refused to pay. Aggrieved, plaintiffs filed this lawsuit.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate only where the movant has demonstrated that there exists no genuine issue of material fact and the movant is entitled to a judgment of law. *Daly v. Sprague,* 675 F.2d 716 (5th Cir.1982). In assessing whether the movant has met the burden of proof, the court will view all the facts and the evidence in the light most favorable to the non-movant. *Federal Deposit Insurance Corp. v. Dawson,* 4 F.3d 1303 (5th Cir.1993). If after this assessment the court finds that there are material factual disputes, then summary judgment is not appropriate. *Id.* On the other hand, if the court finds that in light of the record taken as a whole a rational trier of fact could not find for the non-movant, there is no genuine issue for trial and summary judgment is appropriate. *Sims v. Monumental General Insurance,* 960 F.2d 478 (5th Cir.1992).

## DISCUSSION

■ Under Mississippi law, where the contract is not ambiguous, the intention of the contracting parties should be gleaned solely from the wording of the contract. *Todd v. Deposit Guaranty National Bank,* 849 F.Supp. 1149 (S.D.Miss.1994). In *Heritage Cablevision v. New Albany Electric Power System of the City of New Albany, Mississippi,* 646 So.2d 1305, 1312 (Miss.1994), the Mississippi Supreme Court expounded on the point:

> Our concern is not so much with what the parties may have intended as it is with what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy.

*Heritage Cablevision,* 646 So.2d at 1312, citing *UHS–Qualicare v. Gulf Coast Communi-*

*ty Hospital,* 525 So.2d 746, 754 (Miss.1987). The *Heritage* Court offered further guidance:

> This rule of law is well established. "In contract construction cases our focus is upon the objective fact—the language of the contract. We are concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other." *Osborne v. Bullins,* 549 So.2d 1337, 1339 (Miss.1989). "The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standards. A court must effect a 'determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.'" *Cherry v. Anthony, Gibbs, Sage,* 501 So.2d 416, 419 (Miss. 1987) (quoting *Hunt v. Triplex Safety Glass Co.,* 60 F.2d 92, 94 (6th Cir.1932)).
>
> Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. The rule is well elucidated in the *Cherry* case. "Parole evidence as to surrounding circumstances and intent may be brought in where the contract is ambiguous, but where, as here, the contract was found to be unambiguous it has no place.
>
> The parties are bound by the language of the instrument." *Id. Cherry* also states that "the mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Id.* A reading of the clause in question reveals no such ambiguity, nor does Heritage cite one.

*Heritage Cablevision,* 646 So.2d at 1313.

■ Another aspect of Mississippi's jurisprudence on contracts is also hailed into service here. Under Mississippi law, a party's duty to perform under a contract is excused if the party's contract is based upon the continued existence of an essential condition which ceases to exist. *Merrill Lynch Pierce, Etc. v. B.C. Rogers & Sons,* 696 F.2d 1113 (5th Cir.1983), citing *Gulf v. S.I.R. Co. v. Horn,* 135 Miss. 804, 100 So. 381 (1924); *Piaggio v. Somerville,* 119 Miss. 6, 80 So. 342, 344 (1919).

■ The fact that the State was considering having a master telecommunications contract covering all of the correctional facilities is clearly the basis upon which the contract was made in the first place. When the State decided that it would not seek a master contractor, the basis upon which the parties' contract was made ceased to exist. Consequently, through no fault of the plaintiffs or the defendant, plaintiffs were not in a position to deliver to defendant a five-year exclusive telecommunications contract with the State of Mississippi covering all the State's correctional facilities. At that point, the contract terminated itself by its own terms. Furthermore, from that point on, Talton was free to negotiate for the service contract for the Southeast Mississippi Correctional Facility without any indebtedness to plaintiffs under the contract.

Blowing aside all of the smoke emitted by plaintiffs' complaint, when one focuses upon the depositional testimony of the plaintiffs themselves, the reader is hardpressed to find any fire for plaintiffs' position. Plaintiff Miller offered the following revealing testimony:

Q. Okay. Now, was this—let's look at some of the provisions in the agreement, if you would, sir. The first paragraph there, before they start numbering it, talks about an acceptable five-year contract to provide exclusive inmate pay telephone service for the State of Mississippi penal institutions. What institutions are we talking about?

A. We're talking about three penal institutions, Parchman, Central Mississippi, and the one at Leakesville and the various work release sites.

\* \* \* \* \* \*

Q. So, in March and April, the State was talking about doing a contract for all the facilities?

A. Yeah. Because if you recall during that time, all the local press was on it and all this kind of stuff. The State had been talked [sic] about voiding the contract that was there and issuing a new one. And all the telecommunication outfits that we can ever think of were in Jackson then trying to bid for that.

There was one plum and they wanted to pick it.

Q. So that's what this first sentence—[of the contract meant].

A. Yeah. At that particular point in time, that is what we believe the State was going to do. Subsequently, they didn't do that. South Central Bell showed them, or whoever, the Bell System showed them they were going to lose so much money by cancelling the contract.

Plaintiff Edward Bishop, too, made admissions inimical to his cause.

Q. So, you all approached Mr. Talton. What did you tell him?

A. We told him of our ability to help him.

Q. And, specifically, what was that, as best you recall?

A. To deliver Talton Communications to the position of getting the telephone service for the State penal system.

Q. Now, at the time, was the State talking about having a master contract to cover all of the prisons?

A. Yes.

\* \* \* \* \* \*

Q. Now, in the first paragraph of that [the contract] it speaks of—the one before paragraph number one. It talks about, quote, you're referring to the three of you delivering to us, meaning Talton, an acceptable five-year contract to provide exclusive inmate pay telephone service for the State of Mississippi penal institutions. So, tell me if I'm wrong, but I understand that to mean that you all were talking about delivering to Talton a contract covering Parchman, Greene County, and Rankin County and wherever else?

A. Whatever this says.

Q. For five years?

A. Yeah.

Q. And then over to the next page, the next to last paragraph before the closing comments it says, "in the event you are not successful in securing this contract, understand we will not be held liable to you for securing any contract directly on our own behalf." I understand that to mean that if Miller and Johnson and yourself, Mr. Bishop, did not deliver a five-year contract for all the penal institutions, then the deal is off and Talton can go after a two-year contract on Greene County?

A. Your interpretation is interesting.

Q. Do you think my interpretation is wrong?

A. The contract is self-explicit. And, of course, we agree to do this contract and we carried out that contract.

Finally, plaintiff James Johnson rendered the following testimony:

Q. When the contract was signed back in April, wasn't the State talking about cancelling the contracts for Parchman and wherever else with South Central Bell or LDDS or whoever and offering all the facilities under one big contract to somebody?

A. They may have. I don't recall right now. But we did think that it was not going to be wiped out to the extent that the only thing Talton got was Greene County.

Q. Yes sir.

A. We really thought that it was going to be better than that. And because you say they were talking about offering one big contract?

Q. Well, that's what the first paragraph between you and Talton talks about. Exclusive inmate pay telephone service for the State of Mississippi penal institutions. That would be one big contract, wouldn't it?

A. Uh-huh. That's what we kind of thought was feasible, too.

Q. And, then we got down to June and Mr. Stribbins [sic] sends the letter, Exhibit 5 that you looked at a few moments ago in Mr. Miller's deposition, that they are not going to throw out South Central Bell at Parchman and Rankin County, but they are going to leave them in place so that only Greene County will be bid.

A. Uh-huh.

Q. So that made it impossible to come up with a master contract for the whole state.

A. And they are talking about here about two years. Expiring in October of 1994. So the five-year contract was not feasible.

By their testimony, the plaintiffs acknowledge the legal and factual bases of defendant's motion attacking plaintiffs' breach of contract claim.

In the case *sub judice*, the contract between the parties clearly provides that the plaintiffs were to secure for defendant Talton *exclusive* telecommunications contracts for *all* of the Mississippi correctional facilities. The contract also plainly provides that in the event plaintiffs were unable to deliver the contracts, defendant would not be held liable if it secured any contract on its own behalf.

Plaintiffs know this; they simply hope to hold defendant accountable for what plaintiffs allege defendant orally stated. This is clear from the depositional testimony of Coleman Miller:

Q. (By Mr. Bradley). Looking back at the contract dated April 21, this embodied the deal that you and Mr. Bishop and Mr. Johnson reached with Mr. Talton, right?

A. Not necessarily. It embodied what was written. It didn't embody what was said.

Q. What was said that's not in here, in the writing?

A. What was said was that he was continually asking us to produce information and get things for him and at some point down the line we are going to get our money for doing that.

Q. When did he say that?

A. In the course of the first meeting all along. He was saying this letter of agreement, this contract, you know, was the basis on which we would get paid for that part of it, producing the contract. I said, "what about the front end? You're killing us on the front end. All this information and people we're seeing and arranging things for you and that kind of thing." And he lived up to every one of my nightmares as far as he said one thing and did another.

Q. Well, why didn't you put that in the written document?

A. Because it was his document. It wasn't our document.

Q. But you didn't have to sign it.

A. That's true. We didn't have to sign it, but we did sign it based upon what he wrote and what he said.

Unfortunately for plaintiffs, this is a breach of contract action. As such, this court's directive is to construe the language of the contract and not ascertain some possible, but unexpressed intent of the parties. *Cherry v. Anthony, supra; Heritage Cablevision v. New Albany Electric Power System of the City of New Albany, Mississippi, supra.*

As an alternative basis for recovery, the plaintiffs assert that "although defendant's premature cancellation of the contract prevented plaintiffs from completing their performance under the contract, plaintiffs nevertheless rendered a partial performance of the contract for which they are entitled compensation." This argument is essentially one of quantum merit and also is without merit.

■ To prevail under quantum merit, plaintiff must have performed valuable services or furnished materials for the person sought to be charged. *Lauderdale School Dist. v. Enterprise School Dist.*, 24 F.3d 671, 688 (5th Cir.1994), citing *Redd v. L & A Contracting Co.*, 246 Miss. 548, 151 So.2d 205, 209 (1963). Furthermore, those materials or services must have been accepted, used and enjoyed by a defendant under such circumstances as would reasonably notify the person sought to be charged that the plaintiff expected to be paid when he performed the services or expected to be paid. *Id. See also* 58 *Am.Jur.* 514, Work and Labor, § 6, p. 722.

■ In the instant case, the contract was explicitly "all or nothing" in its terms. The contract expressly provided that in the event Talton was not awarded the master contract, Talton could seek individual service contracts without indebtedness to plaintiffs. Conse-

quently, plaintiffs are simply unable to show that they performed a service of any value for the defendant under circumstances which would notify defendant that plaintiffs expected to be compensated.

A second reason also bars plaintiffs' efforts under this theory of action: this cause of action was never pleaded nor the subject of any motion to amend the complaint. Thus, as argued by defendant, this theory of recovery is not properly before the court. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061 (5th Cir.1994); *Walker v. South Central Bell Tel. Co.*, 904 F.2d 275 (5th Cir.1990); *Sisk v. Texas Wildlife Dept.*, 644 F.2d 1056 (5th Cir.1981); *Investors Syndicate of America, Inc. v. City of Indian Beach, Florida*, 434 F.2d 871 (5th Cir.1978); *Hoshman v. Esso Standard Oil*, 263 F.2d 499 (5th Cir. 1959).

Accordingly, for the reasons above discussed, this court finds that defendant's motion for summary judgment should be granted. A separate judgment shall be entered in accordance with the local rules.

**SO ORDERED AND ADJUDGED.**