**JAG MEDIA HOLDINGS INC., et al.**

v.

**A.G. EDWARDS & SONS INC. et al.**

No. CIV.A. H–02–2867.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 17, 2004.

---

Richard N. Laminack, O'Quinn Laminack et al, Houston, TX, for JAG Media Holdings Inc., et al.

Bidwell & Company, W. Dean Hill Compliance Officer, Portland, OR, pro se.

CIBC World Markets, pro se.

Crowell Weedon & Co., pro se.

Fahnestock & Co. Inc., pro se.

H.G. Wellington & Company Inc., pro se.

Oxford & Company, pro se.

Parker/Hunter Incorporated, pro se.

PAX Clearing Co. LP, pro se.

Primevest Financial Services Inc., pro se.

Robert W. Baird & Co. Incorporated, Milwaukee, WI, pro se.

Scott & Springfellow Inc., pro se.

U.S. Bank National Association, pro se.

Viewtrade Securities, pro se.

National Securities Corporation, pro se.

Oscar Gruss & Son Inc., pro se.

Program Trading Corporation, pro se.

MPAC Capital Partners LP, pro se.

BNJ Capital Securities Corporation, pro se.

Corporate Investments Group Inc., pro se.

First London Securities Corporation, pro se.

Newbridge Securities Corporation, pro se.

Taglich Brothers Inc., pro se.

Sierra Brokerage Services Inc., pro se.

JB Oxford & Company, Beverly Hills, CA, pro se.

Gerard G. Pecht, Peter Andrew Stokes, Fulbright & Jaworski, Eric J.R. Nichols, Beck Redden & Secrest, Janes Ellen Militello, Gregory J. Casas, Locke Liddell et al, Patricia J. Kerrigan, Werner & Kerrigan LLP, John R. Keville, Howrey LLP, Wallis Mizell Hampton, Vinson & Elkins, Charles G. King, III, King & Pennington LLP, Joseph G. Thompson, III, Watt Beckworth et al, Jeffrey Roger Parsons, Beirne Maynard et al, Janiece M. Longoria, Linda Broocks, Ogden Gibson White and Broocks, Charles W. Schwartz, Skadden Arps et al, Tracie J. Renfroe, Bracewell and Giuliani LLP, D. Mitchell McFarland, Harrison Bettis et al, Martyn B. Hill, Pagel Davis & Hill, Houston, TX, C. Evan Stewart, Brown Raysman et al, Daniel R. Murdock, Piero A. Tozzi, Winston & Strawn, Caryn Mazin, Jules Elese Black Angelley, Piper Rudnick LLP, David S. Richan, Blank Rome et al, Jacqueline I. Meyer, Bondy & Schloss LLP, New York, NY, Dan R. Waller, Secore & Waller, Alan W. Harris, Piper Marbury et al, Rodney Acker, Charles A. Gall, Jenkens & Gilchrist, Edwin R. Deyoung, Locke Liddell et al, Sharon J. Shumway, Carrington Coleman et al, Omar Galicia, Wilson Elser et al, Thomas Hal Cook, Jr., Zelle Hofman et al, William N. Radford, Thompson Coe et al, Richard A. Illmer, Brown McCarroll et al, Dallas, TX, Edward Totino, Perrie Weiner, Piper Rudnick, Los Angeles, CA, Jeffrey B. Bailey, Bose McKinney et al, Indianapolis, IN, Brandon S. Reif, James K. Autrey, Crowell Weedon Co., Hermosa

Beach, CA, Gregg Orsag, Attorney at Law, Pittsburgh, PA, Robert B. Bieck, Jr., Thomas K. Potter, III, Jones Walker et al, New Orleans, LA, Philip Frank, Attorney at Law, Jersey City, NJ, Howard N. Kahn, Kahn & Chenkin, Hollywood, FL, Irving M. Einhorn, Attorney at Law, Manhattan Beach, CA, Gregg J. Breitbart, Newbridge Securities Corp., Ft. Lauderdale, FL, for A.G. Edwards & Sons Inc. et al.

## AMENDED ORDER

GILMORE, District Judge.

The Court's Order of September 6, 2004 (Instrument No. 292) is hereby amended as follows:

Pending before the Court is Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings and Memorandum of Law in Support. **(Instrument No. 271)**, Defendants Crowell Weedon & Co. and Lazard Frères & Co. LLC's filed motions to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. **(Instrument Nos. 273 and 274)**, Defendants Comprehensive Capital Co., JB Oxford & Co., Wien Securities Corp. and Program Trading Corp. filed motions to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. **(Instrument Nos. 275, 276 and 279)**, and Defendant Bidwell & Company filed its Motion to Dismiss and Joinder in Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings, and Memorandum of Law in Support. **(Instrument No. 288)**. Having considered the parties' submissions and the applicable law, the Court finds that Defendants' motions to dismiss should be **GRANTED**.

## I.

Plaintiff Jag Media Holdings, Inc. ("Jag Media") and Gary Valinoti (collectively "Plaintiffs") bring this action against defendants, over 100 brokerage firms, investment banks and financial institutions throughout the country (collectively "defendants"), who Plaintiffs allege have "entered into a civil conspiracy and concert of action to short sell Plaintiffs' stock." (Instrument No. 265, at 4–27). Plaintiffs allege that Defendants committed market manipulation and fraud, violating the Securities Exchange Act of 1934 ("Act") Sections 10(b), 10(b)(5), and 20(a) the rules and regulations of the Securities & Exchange Commission. Plaintiffs have abandoned their previous claims under Sections 9, 13 and 16 of the Act, however, they now make a new allegation for restitution under the Act pursuant to Sections 3(a), (4), (5), 28(a) (as amended 15 U.S.C. Sections 78c(a), (4), (5), 78c(1), 78b(a)). Plaintiffs also allege that all defendants committed fraud and deceit, and civil conspiracy to defraud. (Instrument No. 265, at 52–53).

On June 20, 2002, Plaintiffs filed an Original Petition in the Judicial District Court, Harris County, Texas. Defendants timely removed this case to this Court on July 29, 2002. (Instrument No. 1). Plaintiff JAG is a Nevada corporation that provides internet-based equities research and financial information, offering its subscribers a variety of stock market research, news, commentary and analysis including JagNotes.com the company's flagship early morning research program. (Instrument No. 190, at 31). JAG's principal place of business is in Boca Raton, Florida. (Id. at 4). Plaintiff Gary Valinoti is a shareholder and Chief Executive Officer of JAG and a resident of Red Bank, New Jersey. (Id.).

On November 22, 2002 Plaintiffs filed their Second Amended Complaint. (Instrument No. 190). Defendants Crowell,

Weedon & Co.'s (Instrument No. 205); ABN AMRO Securities L.L.C. and BMO Nesbitt Burns Inc. Inc (Instrument No. 208); and M.H. Meyerson & Co., Inc (Instrument No. 230) subsequently filed motions to dismiss Plaintiffs' Second Amended Complaint. In addition, 71 out of the approximately 150 defendants, sued in this case, moved in a single motion to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim. (Instrument No. 211).

Defendants asserted that the underlying failure of Plaintiffs' Second Amended Complaint was that it failed to allege any wrongdoing by any particular defendant. In addition, defendants argued that Plaintiffs fail to properly plead fraud or their conspiracy claim, "all of which require allegations of specificity far greater than the one-size fits all pleadings of the Second Amended Complaint." (Instrument No. 208, at 5). Defendants contended that the facial deficiencies in Plaintiffs' Second Amended Complaint reveal that Plaintiffs improperly group together every defendant. Defendants maintained that Plaintiffs' group pleading fails to state the elements of a securities fraud claim and that Plaintiffs must properly plead wrongdoing and scienter as to each individual defendant. According to the defendants in this case, "there is not doubt that the allegation in the SAC [Second Amended Complaint] improperly groups together the Defendants." (Instrument No. 205, at 4).

On September 30, 2003, after careful review of Plaintiffs' Second Amended Complaint, the defendants' many motions to dismiss, Plaintiffs' responses, and defendants' replies, this Court held the following:

> In this case, Plaintiffs have not established in the record that all or any of the Defendants have violated the Securities Exchange Act. The Plaintiffs have only provided the Court with conclusory allegations and asserted beliefs that have no support in the record. The Second Amended Complaint provides no specifics. Plaintiffs have neither cited nor referred to a single document, conversation or specific Defendant that submitted an inaccurate beneficial holder list and had large gaps where more stock was bought than physically existed.
>
> Plaintiffs' Second Amended Complaint is replete with vague accusations alleging that all the Defendants' representations concerning their physical possession of Plaintiffs' stock are false and that all, more than 100 Defendants', "short" sold Plaintiffs' stock. These claims are supported by Plaintiffs' allegation that "[a]ll named Defendants have profited from declines in the stock price of JAG Media Holdings, Inc." (Instrument No. 190, at 35). "Assertions that would almost universally be true, such as economic self-interest, are inadequate of themselves to plead motive." *Coates v. Heartland Wireless Communs., Inc.,* 55 F.Supp.2d 628, 644 (N.D.Tex.1999). Thus, the Court is left with Plaintiffs' legal conclusion that over 100 firms "short" sold Plaintiffs' stock and conclusory allegations of incomplete beneficial owner lists and no evidence in the record to substantiate Plaintiffs' claims.
>
> . . . .
>
> Based on the foregoing, the Court finds that all motions to dismiss could be granted under this analysis, but would note that this is Plaintiffs first pleading in this federal Court. Therefore, the Court will allow Plaintiffs twenty (20) days to file an Amended Complaint to comply with the pleading requirements of Rule 9(b). . . . Defendants may reurge their motions to dismiss or file new motions after Plaintiffs have filed their Third Amended Complaint. If

Plaintiffs' Complaint suffers from the same defects as the former Complaints, the Court would suggest that the Defendants simply reurge their previous motions.

(Instrument No. 262, at 27–28) ("September 2003 Order").

On October 20, 2003 Plaintiffs filed their Third Amended Complaint in which Plaintiffs again list over 100 defendant brokerage firms, investment banks and financial institutions throughout the country. (Instrument No. 265). The Third Amended Complaint is quite similar to Plaintiffs' Second Amended Complaint. Plaintiffs allege that this case involves an initial scheme by three of the defendants, Mark Valentine, Thompson, Kernaghan & Company and CALP II Limited Partnership ("Financier Defendants"), to defraud Jag Media into selling its convertible preferred stock and other securities to certain defendants via convertible debentures and other devices and caused Jag Media to issue, for less than fair market value, convertible debentures to the Defendants. (Id., at 26). According to Plaintiffs, this initial scheme implemented by the Financier Defendants allowed a second scheme to be developed by both the Financier Defendants and various broker/dealers and market makers to manipulate Jag Media stock for their own personal profit. Plaintiffs claim that "[t]his manipulation was achieved through the use of various trading techniques such as matched trades, washed trades, "painting the tape" and selling counterfeit shares (i.e.—"naked short sales")." (Id., at 27). Plaintiffs contend that this manipulative scheme forced the price of Jag Media stock downward, almost destroying the company. (Id.).

In Plaintiffs' Third Amended Complaint they allege that on June 12, 2000, Jag Media's predecessor, JagNotes.com, Inc., accepted $2,500,000.00 in convertible preferred financing from the Financier Defendants. (Instrument No. 265, at ¶ 153). Plaintiffs assert that the Financier Defendants were "active practitioners of stock fraud and stock manipulation." (Id., at ¶ 138). Plaintiffs contend that entities created, represented or advised by the Financier Defendants invest in micro-cap companies such as Jag Media, that were listed on the NASDAQ, AMEX and OTCBB, through "toxic convertibles" or the issuance of convertible preferred stock and/or common stock with reset provision warrants, and/or convertible debentures. (Id., at ¶ 139). Plaintiffs argue that these types of financial instruments are the vehicles that permit "all Defendants to then profit from a conspiracy to manipulate and ultimately cause the stock price of those companies to decline to mere pennies in most cases and potentially inhibit the ability of such companies to raise capital after the entities make their so-called 'long term,' 'for the benefit of the company' investments." (Id., at 28). The Plaintiffs complain that the lower the price of the stock, the more stock could be acquired through the conversion-based on the conversion formula in the financial instruments. According to Plaintiffs, this gives all of the defendants incentive to take action to cause the stock price to drop. (Id.).

Plaintiffs assert that as share prices decline, more shares will be received by defendants on conversion—allowing the defendants to profit "from various manipulative techniques, illegal short-selling and/or massive naked short selling, which have the effect of counterfeiting shares of the issuer, and generating substantial windfalls for the Defendants if the company goes out of business and the defendants are not required to cover the illegal naked short sales." (Id.). Plaintiffs contend that defendants manipulate the price downward, cover with the stock obtained

from the conversion at the lower price, profiting enormously from the difference between the price at which the stock was sold "short" and the price at conversion, and use the stock from the conversion to drive the price still lower a "death spiral." (Id., at 28).

Plaintiffs contend that after the closing of the convertible preferred financing with the Financier Defendants, "a pattern of extremely high volume trading in Jag Media stock began," and that the price of Jag stock dropped to a low of $0.05 per share. (Id., at ¶ 157). As a result of this decline Plaintiffs claim that they were forced to sell their largest corporate asset to the Financier Defendants to retire the debt owed to the Financier Defendants. (Id., at ¶¶ 155, 158). Plaintiffs allege that the convertible financing arrangement was a "bait and switch." (Id., at 1 ¶ 51). According to Plaintiffs, the Financier Defendants have orchestrated similar "death spiral" financing arrangements with other companies and are now facing additional lawsuits relating to these arrangements. (Id., at ¶ 156).

In February 2001, Jag Media instituted a recapitalization plan, reconstituting Jag Media common stock into new Class A and B shares. To receive both classes of shares of Jag Media stock, broker/dealers were instructed to redeem and surrender the physical stock certificates of Jag Media stock on behalf of their clients. (Instrument No. 265, at 37). On April 8, 2002 the recapitalization of JAG Media Holdings, Inc. f/k/a JagNotes.com, Inc. became effective. The company's transfer agent began issuing new JAG Media Holdings, Inc. Class A and series 1 Class B certificates in the name of all beneficial owners who appeared on the "Beneficial Owner List" that Defendants submitted to the transfer agent as part of the requirements of the shareholder approved recapitalization plan. (Instrument No. 265, at 37–38).

According to the Plaintiffs, a preliminary investigation of trading in Jag Media stock "during the period the Financier Defendants owned convertible securities of Jag Media indicates irregularities for which the only likely explanation is improper trading practices, including matched trades, washed trades and the issuance of counterfeit shares." (Instrument No. 265, at 35). Plaintiffs contend that "proof of actual manipulative trades requires the analysis of individual trades of the market participants which records may only be obtained by judicial order and discovery." (Id.). Consequently, Plaintiffs look to the Depository Trust & Clearing Corporation ("DTCC"), which according to Plaintiffs serves as a holding company for numerous subsidiary businesses, a depository ("DTC"), and provides clearance, settlement and information services for equities, corporate debt, municipal debt, government securities, mortgage-backed securities and emerging markets debts. Plaintiffs assert that the DTCC provides custody and asset servicing for more than two million securities issuers from the United States and 100 other countries and territories. (Id., at 35). Plaintiffs claim that "[i]t is commonly thought in the U.S. that the DTC is the record keeper, the 'accountant' for, the securities held in 'street name,' electronic format at U.S. broker-dealers and clearing firms." (Id.).

Plaintiffs contend that once a shareholder receives his shares from the transfer agent of Jag Media, the shareholder sends those shares to his broker, who then sends them to be deposited in the broker's account at the DTC. Accordingly, Plaintiffs also contend that all shares at the DTC should represent only the shareholders' shares. Plaintiffs describe the DTC Secu-

rity Position Report as the accounting by the DTC, for the shares of the company registered in the name of the DTC. Plaintiffs allege that the number of shares in the security position report should always equal the number of shares registered by the DTC. Plaintiffs claim that each time a company issues new shares into the marketplace, the DTC holding adjusts accordingly, unless a shareholder has physical custody of the share. Which Plaintiffs believe very few Jag Media shareholders do. Thus, Plaintiffs specifically state, that "[s]hares on deposit at the DTC + shares held by investors directly in registered form = total number of outstanding shares." (Instrument No. 265, at 36).

Plaintiffs claim that DTC records are evidence of "excessive trading without corresponding settlements of the DTC which exceeds trading activity a) otherwise explained by bona fide market making activity; b) demonstrates a supply side imbalance [;] c) demonstrates a massive amount of excess shares of Jag Media "trading" [;] and has all of the earmarks of manipulation." (Id., at 38). In Count One Plaintiffs claim that defendants, directly, indirectly, and "with scienter by using the means and instrumentalities of interstate commerce and/or the mails engaged and participated in a continuous course of conduct to conceal adverse material information about the Defendants, provided false information ... and manipulated the price of Jag Media." (Instrument No. 262, at 48). Jag Media brings this claim pursuant to § 10b of the Securities and Exchange Act and Rule 10b–5, against all defendants. Plaintiffs contend that all defendants intended for Jag Media to rely on their misrepresentations, and that Jag Media did actually rely on all of the defendants'

alleged misrepresentations and omissions. (Id., at 47). Specifically, Plaintiffs claim that:

each Defendant knew, intended or acted with reckless abandon, that the Jag Media stock would be manipulated by naked shorting, stacked trades, washed trades, and other manipulative practices.[1] These Defendants, and, each of them knew, intended, or with conduct failed to inform Jag Media that such manipulative trading practices would occur prior to or in conjunction with a purchase or sale of Jag Media stock, specifically the conveyance of Jag Media stock pursuant to conversion notice, and/or purchases of securities by Defendants. Such omissions or failure to tell Jag Media the true intent of these Defendants was in furtherance of the scheme to defraud Jag Media in connection with the purchase of sale of Jag Media securities.... As a result of the manipulation, misstatements and failure to disclose material facts for the Defendants as set forth above, Jag Media was induced to enter various agreements for the purchase of Jag Media common stock.

(Instrument No. 262, at 48).

In Count Two of the Third Amended Complaint, Plaintiffs allege that each defendant manipulated the price of Jag Media's stock causing JagMedia to sell its stock at an artificially deflated price. Plaintiffs contend that the manipulation occurred through defendants causing large volumes of stock to be sold with the intent to artificially depress the price of Jag Media stock. Plaintiffs assert that Defendants injected false information into the market place by dumping a large volume of Jag Media stock on the market, and by

---

1. The Court notes that Plaintiffs do not describe or elaborate on the definition or meaning of "stacked trades" or "washed trades."

using pre-arranged sales, engaging in non-economically feasible trades and washed sales, painting the tape, creating false buy-ins, [and] using trades unreported to the NASD through off-shore entities. (Instrument No. 262, at 50). Plaintiffs contend that each defendant, through these actions violated § 10b of the Securities and Exchange Act and Rule 10b–5. (Id.).

Count Three is a claim for fraud and deceit. Plaintiffs allege that all of the defendants made representations of material facts, knowing that such misrepresentations and omissions were false and knowing that Jag Media did not know they were false. Plaintiffs contend that defendants intended for Jag Media to rely on those false representations.

In Count Four, Plaintiffs claim civil conspiracy to defraud, alleging that "Defendants entered into an agreement, combination, or conspiracy, . . . to commit the tort of fraud against Jag Media. The object of the agreement was to defraud Jag Media . . . and by so doing to acquire the initial shares, additional shares to profit illegally therefrom, and/or to gain eventual control or destruction of Jag Media. The fraud and stock manipulation and other unlawful acts as alleged . . . were committed in furtherance of that agreement predicated on the tort of fraud." (Id., at 53).

Count Five [2] is a claim for restitution pursuant to Sections 3(a), (4), (5), 28(a) of the Act (as amended 15 U.S.C. Sections 78c(a), (4), (5), 78c(1), 78b(a)). Plaintiffs contend that each defendant has made profits from their fraudulent and/or manipulative conduct. Plaintiffs also contend that all of the defendants failed to disclose facts that were material regarding information that might have been considered to be important in making a decision to buy or sell Jag Media stock. Consequently,

according to Plaintiffs, they were "damaged by virtue of each defendants' conduct under 15 U.S.C. 78b(a). Plaintiffs assert that the damages are the difference between the fair value of the shares without fraud and/or manipulative conduct of Defendants and the price of the shares sold with such fraudulent and/or manipulative conduct, except for the situation where the defendant received more than the seller's actual loss, wherein the damages are the defendant's profit." (Id., at 53). In addition, Plaintiffs believe defendants have profited by materially more than the above damages; therefore they are suing all defendants jointly and severally for restitution in accordance with the holding in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). (Id., at 54).

On November 24, 2003, over 75 defendants filed Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings and Memorandum of Law in Support. (Instrument No. 271). "Moving Defendants" are 75 of the approximately 130 brokerage firms, investment banks and financial institutions that Plaintiffs have named in this suit. Moving Defendants assert that Plaintiffs have failed to allege a connection between any Moving Defendant and the Financier Defendants, who are the only defendants alleged to be parties to the convertible financing agreement which Plaintiffs assert provided the motive for the alleged manipulation scheme. (Id., at 1). Moving Defendants argue that absent pleaded facts demonstrating a connection between any Moving Defendant and the Financier Defendants, Plaintiffs are incapable of specifying what the Moving Defendants obtained from the alleged fraud as

---

**2.** Plaintiffs fail to allege a "Count Five" and skip to "Count Six," thus the Court will refer to Plaintiffs' "Count Six" as "Count Five." (Instrument No. 265, at 52–53).

required by this Court in its September 2003 Order. (Id.).

Defendants also contend that Plaintiffs "again have made blanket allegations against more than 100 brokerage firms. In place of pleading specific facts as required by the Court, plaintiffs have cut and pasted excerpts from various charts and e-mails into the Third Amended Complaint, to give their claims the illusion of substance." (Instrument No. 271, at 2). Defendants argue that none of the charts or e-mails inserted by Plaintiffs shows that any Moving Defendant made a single misrepresentation, engaged in a single short sale, had any connection with the Financier Defendants, or otherwise participated in a scheme to defraud. In fact, according to Moving Defendants, more than sixty of the named defendants are not even listed on any of the charts or e-mails, thus precluding any possible basis for liability as to these defendants. (Id., at 2).

Moving Defendants assert that the Third Amended Complaint does not contain any allegations of wrongful conduct by any Moving Defendant in connection with the April 2002 recapitalization, pursuant to which each share of JagNotes.com stock was reconstituted into new Series A and Series B Shares of Jag Media. Moving Defendants note that the April 2002 recapitalization had been the sole basis for Plaintiffs' claim that they had standing under Rule 10b–5. However, in the Third Amended Complaint Plaintiffs focus on alleged "imbalances" and "discrepancies" in the number of shares traded after the April 2002 recapitalization. (Instrument No. 271, at 5).

Moving Defendants conclude, by asserting that having failed to follow the Court's instructions, outlined in its September 2003 Order, Plaintiffs' Third Amended Complaint should be dismissed with prejudice. Moving Defendants argue that the Court should not allow Plaintiffs further leave to amend, because it is clear that the Third Amended Complaint "as weak as it is, represents plaintiffs' 'best case.'" (Id., at 19). Moving Defendants contend that Plaintiffs have violated Rule 9(b) and the PSLRA in numerous critical respects. Moreover, Moving Defendants characterize Plaintiffs' Third Amended Complaint as a "scattershot approach to pleading" which has burdened more than 100 defendants with defending a meritless securities fraud complaint. In fact, more than 60 of the companies named as defendants in the Third Amended Complaint are not even listed on any of the charts to which Plaintiffs refer. Additionally, Moving Defendants argue that Plaintiffs have had more than a year to amend, in order to sufficiently state their claim. Plaintiffs have also had the benefit of the Courts' September 2003 Order, as well as numerous motions to dismiss. According to Moving Defendants, "[t]he only inference from plaintiffs' continued failure to meet the standards set forth in the Court's Order is that plaintiffs simply do not have a viable claim against any Moving Defendant. Thus, any further amendment would be futile and would subject Moving Defendants to additional unwarranted delay, expense and prejudice." (Instrument No. 271, at 20).

Also on November 24, 2003, defendants Crowell Weedon & Co. ("CW") and Lazard Frères & Co. LLC's ("Lazard") filed motions to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (Instrument Nos. 273 and 274). Defendants CW and Lazard also contend that they are only mentioned once in the entire Complaint, when Plaintiffs list the over 100 brokerage firms as defendants in this suit. (Instrument No. 274, at 2 and No. 273, at 3). CW argues that the only statement in

the Third Amended Complaint "to somehow hold together every Defendant is the claim that every Defendant sold "short" Jag stock through some web of 'civil conspiracy and a concert of action' ... However, paragraph 182 of the [Third Amended Complaint] contains no facts; it is a mere summary statement and conclusion of law." (Instrument No. 273, at 3). Lazard contends that the absence of reference to Lazard other than jurisdictional allegations clearly demonstrates that Plaintiffs' Third Amended Complaint "fails to allege any specific facts that show they are entitled to relief on their claims against Lazard. Therefore, according to Lazard, Plaintiffs' Third Amended Complaint fails to state a claim against Lazard upon which relief can be granted and should be dismissed as to Lazard pursuant to 12(b)(6)." (Instrument No. 274, at 8).

On December 10, 2003, Comprehensive Capital Co. filed a motion to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (Instrument No. 275). On December 15, 2003, JB Oxford & Co. filed a motion to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (Instrument No. 276). On December 23, 2003, Wien Securities Corp. and Program Trading Corp. filed a motion to join Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (Instrument No. 279).

On January 21, 2004 Plaintiffs' Response in Opposition to Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (Instrument No. 284). Plaintiffs argue that defendants are attempting to convince the Court that it must do more than "assert legitimate allegations against the Moving Defendants, but they must also prove their case, beyond all doubt, before discovery has even begun." (Id., at 1). Plaintiffs argue that this "simply cannot be the truth, because if it is the truth, the Moving Defendants will be rewarded for hiding the truth of their activities from the Plaintiffs, the Court, the general public and financial markets." (Id.). According to Plaintiffs, their Third Amended Complaint specifically describes and lists various schemes, planned and carried out by the Moving Defendants which damaged Plaintiffs. (Id., at 2). Plaintiffs assert that they have pled with sufficient particularity and that the Third Amended Complaint specifically discusses the uncovered short positions that defendants currently hold and the steps defendants have taken to avoid detection of these uncovered positions.

Plaintiffs contend that the significant imbalance in the total shares that each Defendant actually holds and the total number of shares that each defendant should hold is evidence of manipulation, misrepresentation, fraud and civil conspiracy. (Instrument No. 284, at 2). Plaintiffs assert without authority that "[a]dditionally and alternatively, Plaintiffs are entitled to a more lenient pleading standard given the litigation; thus, their claims should be allowed to proceed and discovery should be conducted in this litigation." (Id., at 3). Plaintiffs do not concede that the Third Amended Complaint is defective, however, they contend that their complaint must be read in light of relevant case law. (Id., at 5). Plaintiffs argue that it would be unfair to force Plaintiffs to plead facts and evidence, which are currently in the sole possession of Defendants. Plaintiffs claim that they "have adequately described the manipulative acts performed and the damage that they have suffered as a result of those acts. It is only when the discovery phase of this litigation begins, that the Plaintiffs will

have access to what the Defendants already know, but aren't telling." (Id.).

Plaintiffs assert that they have standing to bring this suit and that Moving Defendants erroneously argue that Plaintiffs have abandoned their claims to standing in this case. According to Plaintiffs, they have standing to bring these claims under Rule 10b–5 through the April 2002 recapitalization which clearly qualifies as a "purchase or sale" of securities. Plaintiffs argue that throughout the entire course of what Plaintiffs describe as the "manipulation" Plaintiffs were sellers of their own stock through the recapitalization. Plaintiffs' contend that the Third Amended Complaint describes the manipulative and deceptive practices of the Defendants, which force Plaintiffs, to issue new shares of Class A and Series 1 Class B certificates as part of a recapitalization plan for the company. Plaintiffs argue that the long-standing rule in the Fifth Circuit is that a corporation issuing its own shares is a seller of securities for purposes of Rule 10b–5. Plaintiffs, as issuers of new Class A and Series 1 Class B shares, fall into the category of "seller" as defined by the Act itself and the Fifth Circuit case law interpreting the definition of seller. Thus, Plaintiffs argue that their status as seller gives them standing to bring their causes of action. (Id., at 6).

Plaintiffs also allege that the additional information provided by Plaintiffs clearly illustrates the deceptive patterns used by the Moving Defendants to manipulate Plaintiffs' stock. According to Plaintiffs, the discrepancies between the Moving Defendants DTC positions and the actual volume of shares traded "crystalize the nature of the fraud being perpetrated on the Plaintiffs. Plaintiffs argue that the discrepancies in the DTC figures illustrate an obvious pattern of deceit by all Defendants." (Id., at 6). Plaintiffs also reiterate their claim that the "positions reported" to the DTC are specific representations made by specific Moving Defendants. (Id., at 7).

On March 30, 2004 Defendant Bidwell & Company ("Bidwell") filed its Motion to Dismiss and Joinder in Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings, and Memorandum of Law in Support. (Instrument No. 288). Bidwell contends that not only are Plaintiffs allegations conclusory, several of the alleged discrepancies do not even mention Bidwell. (Id., at 1). Defendant Bidwell asserts that Plaintiffs' allegation that a history of volume trading activity in Jag Media, which Plaintiffs contend exceeded the balances of stock on file with the DTC, is not sufficient "evidence" to support Plaintiffs' claims. According to Bidwell, "a review of the total volume in the market generally does not lead to an inference that Bidwell's holding of 1,901 shares on behalf of its customers was part of some larger manipulation scheme; in any case, such a bare allegation falls well below the pleading requirements." (Id., at 2–3). Bidwell argues that the absence of any reference to Bidwell having a disparity between the DTC report and the proxy communications, and the absence of a claim that Bidwell was not able to exchange the stock following the recapitalization, demonstrate that the Third Amended Complaint fails to satisfy Rule 8(a)(2) and consequently fails to state a claim against Bidwell upon which relief can be granted. (Id., at 9).

## II.

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Such dismissals are to be viewed with disfavor and are rarely granted. *Shipp v. McMahon,* 199 F.3d 256, 260

(5th Cir.2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982)). They will only be granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Oliver v. Scott,* 276 F.3d 736, 740 (5th Cir.2002). Dismissal should not be granted unless the party would not be entitled to relief under any set of facts or any possible legal theory that could consistently be proven with the allegations in the complaint. *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir. 1999).

In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiff's complaint. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). In addition, the facts are viewed in a light most favorable to the plaintiff. *Id.* "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Vulcan Materials Co. v. City of Tehuacana,* 238 F.3d 382, 387 (5th Cir. 2001) (quoting *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993)).

■ A dismissal for failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure is treated as a dismissal for failure to state a claim upon which relief may be granted. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). The Federal Rules of Civil Procedure require that a complaint contain only a 'short and plain statement' of the claim showing that the pleader is entitled to relief. FED. R. CIV. P. 8(a). However, under Rule 9(b) "in all averments of fraud or mistake, the circumstances consti-

tuting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." FED R. CIV. P. 9(b). Rule 9(b) "was formulated to ensure that defendants can effectively respond to plaintiffs' allegations, to prevent the filing of baseless complaints to obtain discovery on unknown wrongs, and to protect defendants from unfounded allegations of wrongdoing which might injure their reputations." *Hernandez v. Ciba–Geigy Corp. USA,* 200 F.R.D. 285, 290 (S.D.Tex.2001).

The relationship between Rules 8(a) and 9(b) is "complimentary ... [the rules] must be read in that fashion, avoiding an exclusive focusing on the requirements of one or the other." *Mitchell Energy Corp. v. Martin,* 616 F.Supp. 924, 927 (S.D.Tex. 1985) (quoting *Brown v. Joiner Int'l,* 523 F.Supp. 333, 335–36 (S.D.Ga.1981)). In applying Rule 9(b), the Fifth Circuit has noted that the particularity standard of Rule 9(b) must be interpreted in conjunction with Rule 8's requirement that the pleading contain a short and plain statement of the claims. *See Corwin v. Marney, Orton Investments,* 788 F.2d 1063, 1068 n. 4 (5th Cir.1986). " '[A]lthough Rule 9(b) calls for fraud to be pleaded with particularity, the allegations must still be as short, plain, simple, direct, and concise as is reasonable under the circumstances.' Rule 9(b) should not be read so as to obliterate this basic pleading philosophy." *Id.* (quoting 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1291 at 389 (1st ed.1969)).

■ "A complaint need not ... state all facts pertinent to a case in order to satisfy the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of America,* 9 F.Supp.2d 734 (S.D.Tex.1998) (citing *Mitchell Energy Corp. v. Martin,* 616

F.Supp. 924, 927 (S.D.Tex.1985)). However, "pleading fraud with particularity in this circuit requires time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir. 1997) (citing *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994)). Furthermore, "articulating the elements of fraud with particularity requires a plaintiff to ... explain why the statements [that were allegedly made] were fraudulent." *Williams,* 112 F.3d at 177 (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Thus, the focus of a Rule 9(b) inquiry should be whether,

> given the nature and facts of the case and the circumstances of the parties, the pleading in question is sufficiently particular to satisfy the purposes of Rule 9(b). The rule has three purposes. First, to ensure that the allegations are specific enough to inform a defendant of the act of which the plaintiff complains and to enable him to prepare an effective response and defense. Second, it eliminates those complaints filed "as a pretext for discovery of unknown wrongs." ... Third, Rule 9(b) seeks to protect defendants from unfounded charges of wrongdoing which inquire their reputations and goodwill.

*Mitchell,* 616 F.Supp. at 927 (citations omitted).

■ State law claims of common law fraud and negligent misrepresentation are also subject to the requirements of Rule 9(b). *Williams,* 112 F.3d at 177. When a party has failed to plead with sufficient particularity, the Court will almost always permit leave to amend to bring the complaint into compliance with the requirements of Rule 9(b). *Summer v. Land &*

*Leisure, Inc.,* 664 F.2d 965, 971 (5th Cir. 1981) (citing 2A Moore's Federal Practice, P 9.03). In fact, "a court's discretion to dismiss a pleading without affording leave to amend is restricted by Rule 15(a), which directs that leave to amend shall be freely given when justice requires ..." 2 MOORE'S FEDERAL PRACTICE § 9.03[4] (3d. ed.1997).

### III.

### A.

■ As the Court stated in its September 2003 Order, in order to state a claim under section 10(b) of the 1934 Act and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

In 1995, the PSLRA amended the Securities Exchange Act of 1934 to provide in relevant part:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4 (b)(2).

The PSLRA also provides that if a plaintiff does not meet this requirement, the district court "shall," on defendant's motion, "dismiss the complaint." *Id.* § 78u–4(b)(3). The plain language of the statute makes clear that the Fifth Circuit's previous rule, which required that a plaintiff plead facts that merely "support an infer-

ence of fraud," has been supplanted by the PSLRA's "strong inference" requirement. Since the passage of the PSLRA, the Fifth Circuit has held that in order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b–5 claim must now plead specific facts giving rise to a "strong inference" of scienter. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001). A plaintiff will not survive a Rule 9(b) motion to dismiss on the pleadings by simply alleging that a defendant had fraudulent intent. In order to adequately plead scienter, a plaintiff must set forth specific facts to support an inference of fraud. *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir.1996); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994).

In Plaintiffs' Third Amended Complaint, in support of their claim of market manipulation, Plaintiffs refer to and compare four charts. The first chart is a DTC Weekly Security Position Listing, Daily Closing Balances for the Week Ending December 13, 2002, after Jag Media's recapitalization had become effective in April 2002. Plaintiffs contend that the DTC closing balance sheets demonstrate that, "according to the DTC's records, Jag Media stock showed a trading volume of 127,-905 shares or –00.1% change during the week of December 9" through December 13, 2003. Plaintiffs claim that the figures represented on the DTC balance sheets are the "Broker/Dealer Defendants' "official statements" to the DTC and to Jag Media memorializing their trading activity in Jag Media stock for that week." (Id., at 41).

The second chart is from Yahoo! and reflects the alleged total trading volume for the week ending December 13, 2002, however, it does not contain firm-specific information. Plaintiffs then argue that during the week of December 9–13, 2003

the Broker/Dealer Defendants and clearing Market Maker Defendants officially reported to the DTC, overall trading of approximately 18,000 shares of Jag Media stock. However, a historical view of trading in Jag Media stock for the same time period reflects over 4,000,000 shares of Jag Media stock were actually traded. According to Plaintiffs, the "only explanation of the 3,982,000 share difference is washed trades and/or the creation of counterfeit shares (i.e. naked short sales)." (Id., at 41).

Plaintiffs continue to refer to DTC reports in March and April 2003 to show discrepancies between what Plaintiffs claim that defendants represented to DTC as the amount of shares they sold or held and what they reported in their proxy communications. (Instrument No. 262, at 42). Plaintiffs do not cite to any exhibits of any defendants proxy documentation. Specifically, in the third chart, Plaintiffs compare the DTC Opening Positions for 26 brokerage firms on March 28, 2003 to the number of "non-objecting beneficial owners" for the same 26 firms as listed on the ADP Investor Communication website as of March 25, 2003. (Id., at 41). Plaintiffs conclude by asserting that defendants did not have actual possession of the number of the shares they purported to have. Thus, Plaintiffs argue that the defendants had routinely been reporting false information to the DTC, the investing public and to Jag Media. (Id., at 45).

In addition, on March 18, 2003 Plaintiffs announced a special stock dividend that would be implemented in April 2003. The special stock dividend took the form of new redeemable Series 2 Class B common stock that was distributed by Jag Media's beneficial stockholders as of the dividend record date of April 14, 2003. The dividend was distributed to beneficial owner's of the Company's Class A common stock

as of April 14, 2003 in a ration of one share of Series 2 Class B common stock for every 100 shares of Class A common stock owned. Plaintiffs contend that certain defendants represented to the DTC and to Jag Media via the April 14, 2003 DTC Weekly Special Security Position Listing that they held a certain number of shares, when in actuality they did not. Plaintiffs do not clearly state what they are comparing the final April 14, 2003 DTC chart to in order to surmise that the defendants did not have actual possession of the number of shares they allegedly purported to have. (Instrument No. 265, at 43–45).

During the April 2003 distribution of the special stock dividend, Plaintiffs allege that "many Defendants wrote in to the Jag Media website requesting guidance on how to cover their positions in order to receive their customers' (i.e. Jag Media shareholders') stock dividend." (Instrument No. 265, at 45). Plaintiffs claim that the six e-mails referred to in the Third Amended Complaint represent admissions of manipulative activity by the five defendants that sent the e-mails. (Instrument No. 265, at, 46). Plaintiffs contend that although the Broker/Dealer Defendant and the Market Maker Defendants repeatedly argue that they have not taken part in any market manipulations, the alleged discrepancies described in the DTC reports and in the April 2003 e-mails "prove something entirely different." (Id., at 46).

Moving Defendants [3] argue that "there is no basis to allege that any Moving Defendant 'engaged in short sales for the purpose of artificially depressing the prices' of JagNotes stock, nor have plaintiffs pled facts giving rise to a 'strong inference' of scienter as required under the PSLRA.[4]" (Instrument No. 271, at 8). Therefore, Moving Defendants conclude that Plaintiffs have not sufficiently alleged a Rule 10b–5 claim. (Id.). Defendants assert that aside from the charts and e-mails referred to in the Third Amended Complaint, Plaintiffs make no attempt to identify the roles of any individual defendant and repeatedly refer to "Defendants," presumably comprising the Financier Defendants and Moving Defendants, as an undifferentiated mass. (Instrument No. 271, at 9).

Moving Defendants assert that Plaintiffs base their case against Moving Defendants on the allegation that some purchasing brokerage firms were unable to obtain delivery of shares from short sellers which resulted in a "fail to receive" on the purchasing broker's books. Moving Defendants argue that even if Plaintiffs' allegation were true, "fail to receive" does not constitute market manipulation or fraud. (Id., at 9). Moving Defendants contend that Plaintiffs have failed to plead facts demonstrating that a difficulty in settling trades "connotes intentional or willful conduct designed to deceive or defraud." (Id., at 10).

Moving Defendants also assert that the DTC charts do not support a claim against any Moving Defendant, because the DTC Weekly Security Position Listing that Plaintiffs refer to is a daily closing of balances for the week ending December 13, 2002 while the chart Plaintiffs compare

---

3. The Court now collectively refers to "Moving Defendants" as the original 75 defendants who filed their Motion Dismiss Plaintiffs' Third Amended Complaint (Instrument No. 271) in addition to the six firms (Crowell Weedon & Co. ("CW"), Lazard Frères & Co. LLC's ("Lazard"), and Bidwell & Company ("Bidwell"); Comprehensive Capital Co.; JB Oxford & Co.; Wien Securities Corp.; and Program Trading Corp.) who filed motions to join the original Moving Defendants' motion to dismiss.

4. Private Securities Litigation Reform Act of 1995 ("PSLRA").

it to is allegedly the total trading volume for the same week as reported on Yahoo!, which unlike the DTC report does not purport to contain firm-specific information. Consequently, Moving Defendants contend that Plaintiffs' claim that because the Yahoo! trading volume exceeds the total day-to day change in the closing balance of certain Moving Defendants listed on the DTC report, each entity listed on the DTC report must be guilty of market manipulation, is without merit. In addition, Moving Defendants claim that Plaintiffs' allegations are insufficient under Rule 9(b) and the PSLRA. (Id., at 12). Moreover, Moving Defendants allege that the DTC reports do not constitute "representations" or official statements by the brokerage firms, contrary to Plaintiffs' assertions. (Id., at 13). According to Moving Defendants, the DTC Security Position Reports are representations by DTC of the number of securities DTC is holding for each firm. Thus, the DTC Security Position Reports do not reflect "representations" by the brokerage firms. (Id., at 11–13).

Moving Defendants argue that Plaintiffs' Third Amended Complaint reveals that Plaintiffs' allegation of standing on which the Court relied in its September 2003 Order, was baseless. In opposing Moving Defendants' prior motion to dismiss, Plaintiffs claimed that the alleged short-selling scheme forced them to recapitalize in April 2002, and that the April 2002 recapitalization was a "purchase or sale" of securities for purposes of standing under Rule 10b–5. However, in the Third Amended Complaint Plaintiffs barely mention the April 2002 recapitalization. Moving Defendants note that all of the allegations of wrongdoing directed against them by Plaintiffs involved alleged trades or misrepresentations that occurred much later, in December 2002, March and April 2003. (Instrument No. 271, at 16). Thus,

Moving Defendants argue, even if the April 2002 recapitalization itself was a purchase or sale, it cannot be argued that the recapitalization was done in connection with alleged trading activity or misrepresentations that did not occur until December 2002 or March/April 2003, or that there somehow was a causal relationship between the alleged trades and related misrepresentations in December 2002 or March/April 2003 and the April 2002 recapitalization. (Id.,at 16). Moving Defendants contend that "[t]here are simply no allegations in the Third Amended Complaint regarding alleged manipulation or misrepresentations that occurred *before* the April 2002 recapitalization. Accordingly, the case should be dismissed." (Id., at 16) (emphasis in original).

Plaintiffs provide this Court with no evidence to support their assertion regarding the DTC Reports being "official statements" from the brokerage firms to Plaintiffs. Even according to Plaintiffs, the DTC reports are accounting statements issued by DTC which reflect what each firm has on deposit with DTC. (Instrument No. 265, at 36). Accordingly, the DTC Security Position Reports are representations by DTC of the number of securities DTC is holding for each firm. Thus, Plaintiffs still fail to meet the above standard of alleging a "misstatement or omission".

In addition, Plaintiffs' comparisons between DTC Week Ending balances and that same week's trading volume are unhelpful. The chart generated by Yahoo! reflects the total trading volume for each day (i.e. reporting the number of sales and purchases transacted on a given day), the closing balance of each brokerage firm in the DTC chart represents a snapshot of the number of shares held by each brokerage firm at the close of each day. Thus,

comparing the charts are like comparing apples and oranges.

Further, a review of the DTC Weekly Security Position Listing Daily Closing Balances for the Week Ending December 13, 2002 reveals that Plaintiffs' arithmetic is indecipherable. Plaintiffs assert that the DTC chart shows "a trading volume of 127,905 shares" for the entire week. Plaintiffs do not explain how they come to this figure and then two paragraphs later Plaintiffs allege that during the week of December 9–13, 2003, the defendants "officially reported" to the DTC overall trading of approximately 18,000 shares of Jag Media stock. (Instrument No. 265, at 41). As Moving Defendants noted, it appears that Plaintiffs reached this number by adding all the numbers in the far right column, entitled "Week," taking into account the "minus" sign. This result is erroneous, because Plaintiffs' method would add a sale of 10 shares by one broker and purchase of shares by another broker as reflecting a trading "volume" of zero. In contrast, adding all the positive numbers together reveals that at least 512, 997 shares were acquired over the course of the week, while adding the negative numbers shows that at least 530,902 shares were sold. The far right column accounts for the net change in each firm's position over the course of the week. Therefore, the amount neither takes into account the daily change in each firm's closing position, nor does it reflect multiple trades during a single day. (Instrument No. 271).

The e-mails Plaintiffs refer to show only that some defendants experienced "fails," which does not establish that all the defendant brokerage firms participated in market manipulation. Further, the e-mails demonstrate that the brokerage firms who sent the e-mails were trying to make an effort to obtain the dividend, not commit fraud or deceive Plaintiffs.

Under Rule 9(b) and the PSLRA, Plaintiffs' have not demonstrated sufficient evidence to state their claim that the individual Moving Defendants participated in a scheme to defraud Plaintiffs. *In re Enron Corp. Sec. Litig.*, 258 F.Supp.2d 576, 627 n. 56 (S.D.Tex.2003) ("plaintiff must allege that each defendant in the scheme committed a prohibited manipulative or deceptive act in furtherance of the scheme to state a claim against that defendant"). Consequently, the charts and e-mails do not show that any of the Moving Defendants made a representation to Plaintiffs that Plaintiffs relied on, fraudulent or otherwise.

In addition, Plaintiffs' allegations do not show that any defendant intended to deceive investors or depress the price of JagNotes.com stock or knowingly or recklessly made any material misrepresentation to the Plaintiffs. *Chartwell Healthcare v. Peoples Home Health,* No. 3:96–CV–1938–G, 1997 WL 86435, at *2, 1997 U.S. Dist. LEXIS 4659, *5–6 (N.D.Tex. Feb. 19, 1997). Moreover, Plaintiffs continue to allege, with no support, that the "only explanation" of the alleged discrepancies is "washed trades and/or the creation of counterfeit shares (i.e. naked short sales)." (Id., at 41). Accordingly, the Court finds that Plaintiffs 10–b and Rule 10–b–5 claims in Count One and Count Two should be dismissed.

### B.

Plaintiffs contend in Count Three of the Third Amended Complaint, that Defendants made representations of material facts, knowing that such misrepresentations and omissions were false, and knowing that Jag Media was unaware of the falsity, with the intent that Jag Media would rely on these allegedly false representations. (Instrument No. 265, at 52).

Moving Defendants assert that Plaintiffs cannot allege that they relied on the alleged fraud in late 2002 and early 2003 at the time of the April 2002 recapitalization. Therefore, Moving Defendants contend that as a matter of law, a plaintiff cannot sue for alleged fraud that occurred after the Plaintiff's purchase or sale of securities. (Id., at 17). Moving Defendants also contend that Plaintiffs' common law fraud claim fails under Rule 9(b).

■ The elements for fraudulent inducement are the same as those for fraud, namely (1) a material misrepresentation; (2) that is false; (3) made with knowledge of its falsity or recklessness as to its truth; (4) made with the intention that it should be acted upon by another party; (5) relied upon by the other party; and (6) causing injury. *See DeSantis v. Wackenhut,* 793 S.W.2d 670, 688 (Tex.1990). Federal Rules of Civil Procedure 9(b) applies to securities fraud. *See Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The Fifth Circuit has construed Rule 9(b) strictly when analyzing securities fraud claims, requiring plaintiffs bringing such claims not only to state the "specific time, place, and contents of the false representations" but also "the identity of the person making the misrepresentations and what the person obtained thereby." *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir. 1994) (citing *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993)).

■ Plaintiffs' failure to plead facts showing fraudulent intent, reliance or causation negates their claim for common law fraud. Plaintiffs' failure to allege any con-

nection between any Moving Defendant and the Financier Defendants, as well as Plaintiffs' failure to allege what benefit any Moving Defendant "obtained thereby." In addition, Plaintiffs still have not identified the individuals who made the allegedly fraudulent statements, or the specific time, place and contents of each allegedly fraudulent statement and how each statement was fraudulent. *Melder,* 27 F.3d at 1100. Accordingly, the Court is compelled to dismiss Plaintiffs' common law fraud claim.

### C.

Plaintiffs state in Count Four of the Third Amended Complaint that the

Defendants entered into an agreement, combination, or conspiracy, which continued at all material times [sic] to commit the tort of fraud against Jag Media. The object of the agreement was to defraud Jag Media as alleged above and by so doing to acquire the initial shares, additional shares to profit illegally therefrom, and/or to gain eventual control or destruction of Jag Media. The fraud and stock manipulation and other unlawful acts as alleged above were committed in furtherance of that agreement predicated on the tort of fraud. As allege above, the agreement proximately damaged Jag Media.

(Instrument No. 265, at 53).

According to Moving Defendants, Plaintiffs' civil conspiracy claim fails again for lack of an underlying tort. As Moving Defendants argued in their prior motion to dismiss, because Plaintiffs' claim for "civil conspiracy to defraud" is a "derivative tort," Plaintiffs' failure to state a substantive claim for fraud or manipulation compels dismissal of their conspiracy claim.

■ A conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful

purpose by unlawful means. In order to recover for conspiracy, Plaintiffs must prove by a preponderance of the evidence that:

(1) two or more persons:

(2) had an object to be accomplished;

(3) that there was a meeting of the minds on the subject or course of action;

(4) that there was one or more unlawful acts; and

(5) that Plaintiffs were damaged as a proximate result.

*See Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1194 (5th Cir. 1995).

■ In this case, Plaintiffs have not demonstrated any evidence to support a meeting of the minds between any of the defendants, nor have they established that one or more unlawful, overt acts occurred. Therefore, Plaintiffs have failed to properly allege the elements required to state a claim for civil conspiracy. Moreover, as the Court discussed in its September 2003 Order, Plaintiffs' claim for "civil conspiracy to defraud" is a "derivative tort," thus, Plaintiffs' failure to state a substantive claim for fraud or manipulation requires a dismissal of their conspiracy claim.

**D.**

In what Plaintiffs' refer to as "Count Six," Plaintiffs make a claim for restitution under the Securities Exchange Act section 3(a), (4), (5), and 28(a). Plaintiffs claim that each defendant in this case "failed to disclose facts that were material" to investors and that Plaintiffs were "damaged by each defendants' conduct under 15 U.S.C. 78b(a)." (Instrument No. 265, at 53). Plaintiffs claim that they are entitled to "damages [which] are the difference between the fair value of the shares without fraud and/or manipulative conduct of Defendants and the price of the shares sold with such fraudulent and/or manipulative conduct." (Id.). Plaintiffs also cite *Affiliated Ute Citizens v. U.S.,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) in support of their claim. In addition, Moving Defendants claim that Plaintiffs' "restitution" claim presupposes liability under Rule 10b–5. Moving Defendants assert that Plaintiffs' restitution claim, which is based on the Supreme Court case Affiliate Ute Citizens fails because liability in that case was predicated on Rule 10b–5 itself, not on a separate free-standing "restitution" theory. (Instrument No. 271, at 18). Moreover, Moving Defendants claim that neither Section 3 nor Section 28a of the Act provides for an independent private right of action. Thus, Moving Defendants argue that because Plaintiffs have failed to allege a basis for liability under Rule 10b–5, their "restitution" claim should be dismissed. (Id.).

■ Moving Defendants claim that Plaintiffs' "restitution" claim presupposes liability under Rule 10b–5. Moving Defendants also assert that Plaintiffs' restitution claims, which is based on the Supreme Court case *Affiliated Ute Citizens* fail because liability in that case was predicated on Rule 10b–5 itself, not on a separate free-standing "restitution" theory. (Instrument No. 271, at 18). Moreover Moving Defendants claim that neither Section 3 nor Section 28a of the Act provide for an independent private right of action. Thus, Moving Defendants argue that because Plaintiffs have failed to allege a basis for liability under Rule 10b–5, their "restitution" claim should be dismissed. (Id.).

■ "A failure to disclose information is not fraudulent unless one has an affirmative duty to disclose, such as where a confidential or fiduciary relationship exists between the parties." *Conger v. Danek Med.,* 27 F.Supp.2d 717, 722 (N.D.Tex. 1998); *Chiarella v. United States,* 445 U.S.

222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' ") (quoting Restatement (Second) of Torts § 551(2)(a) (1976)). In this case, Plaintiffs have failed to allege any type of confidential or fiduciary relationship between Moving Defendants and Plaintiffs. Further, even assuming that some Moving Defendants had short positions, Moving Defendants had no obligation to disclose them to Plaintiffs. *Sullivan & Long v. Scattered Corp.*, 47 F.3d 857, 863 (7th Cir.1995) (there is no requirement of public disclosure of short sales).

In addition, as Moving Defendants noted, in *Affiliated Ute Citizens*, the Court predicated liability on Rule 10b–5, there was no finding of an independent restitution theory. *Id.* at 144–45, 152–53 (Clearly, the Court of Appeals was right to the extent that it held that the two employees had violated Rule 10b–5). Consequently, because Plaintiffs have failed to allege a basis for liability under Rule 10b–5, Plaintiffs' claim for restitution should be dismissed.

▮ When a party has failed to plead with sufficient particularity, the Court will almost always permit leave to amend to bring the complaint into compliance with the requirement of Rule 9(b). *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 971 (5th Cir.1981) (citing 2A Moore's Federal Practice, P 9.03). However, the decision to allow amendment of pleadings is within the sound discretion of the court. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021

(5th Cir.1994). In determining whether to allow an amendment of the pleadings, the court considers the following: undue delay in the proceedings, undue prejudice to the opposing parties, timeliness of the amendment, and futility of the amendment. *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1163 (5th Cir.1982); *Lemmer v. Nu–Kote Holding, Inc.*, 2001 WL 1112577, at *12, 2001 U.S. Dist. LEXIS 13978, 42–43 (N.D.Tex.2001).

The Court concludes that allowing Plaintiffs to replead is inappropriate for several reasons. In this case, there are multiple deficiencies within the Third Amended Complaint. Claims against Moving Defendants are subject to dismissal for failure to satisfy Rule 9(b)'s and PSLRA's particularity requirements and failure to adequately plead scienter. Claims against Moving Defendants are further subject to dismissal for failure to plead specific misrepresentations, or manipulative or deceptive acts by the defendants. Plaintiffs have had more than a year to state their claims, in addition they have had the benefit of this Court's September 2003 Order as well as numerous motions to dismiss. The only conclusion that this Court can come to by Plaintiffs' continued failure to meet the standards set forth in the Court's Order is that Plaintiffs do not have a viable claim against the Moving Defendants. Further, grounds for dismissal might well exist in Moving Defendants' arguments that the Court did not address. The extent of the deficiencies in the Third Amended Complaint is a strong indication that amendment would be futile.

### IV.

Based on the foregoing, Moving Defendants'[5] Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on

---

**5.** A.G. Edwards & Sons, Inc.; Bear Stearns Securities Corp.; Citibank; Credit Suisse First Boston Corporation; David Lerner Associates, Inc.; Donaldson, Lufkin & Jenrette

the Pleadings, and Memorandum of Law in Support (**Instrument No. 271**); Joinder of Defendant Crowell, Weedon & Co. to Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings, and Memorandum of Law in Support (**Instrument No. 273**); Joinder of Defendant Lazard Frères & Co. LLC to Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (**Instrument Nos. 274**); Joinder of Defendants Comprehensive Capital Co., JB Oxford & Co., Wien Securities Corp. and Program Trading Corp. to Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings. (**Instrument Nos. 275, 276 and 279**); and Defendant Bidwell & Company's Motion to Dismiss and Joinder to Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint and for Judgment on the Pleadings, and Memorandum of Law in Support. (**Instrument No. 288**) are all **GRANTED**.

The Clerk shall enter this Order and provide a copy to all parties.

Securities Corporation; Dresdner Kleinwort Wasserstein; Edward Jones & Company; First Southwest Company; Forge Financial Group, Inc.; Harris Investorline Inc.; Hill Thompson Magid & Company, Inc.; H & R Block Financial Advisors; Janney Montgomery Scott LLC; LaBranch Financial Services, Inc.; Lehman Brothers, Inc.; Mesirow Financial, Inc.; Morgan Stanley; National Financial Services L.L.C.; National Securities Corp.; Parker/Hunter Incorporated; Prime Vest Financial Services, Inc. Preferred Trade; Prudential Securities Incorporated; RBC Dain Rauscher, Inc.; Romano Brothers & Co.; SG Cowen Securities Corporation; U.S. Bank National Association; U.S. Bank National Association; and Viewtrade Securities, Inc.; BrokerageAmerica, Inc.; Goldman, Sachs & Co.; Spear, Leeds & Kellogg, L.P.; GunnAllen Financial, Inc.; LPL Financial Services; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Herzog Heine Geduld, L.L.C.; Deutsche Bank Securities, Inc.; NDB Capital Markets, L.P.; Fleet Securities, Inc.; Wells Fargo Investments, L.L.C.; UBS Financial Services, Inc.; UBS Warburg L.L.C.; Instinet Clearing Service, Inc.; Donald & Co. Securities Inc.; Stephens, Inc.; Online Securities, Inc.;Stifel, Nicolaus, Inc.; Legg Mason Wood Walker, Inc.; Scottrade, Inc.; J.P. Morgan Chase Bank; Brown & Company Securities Corp; Dreyfus Brokerage Services, Inc.; McDonald Investments, Inc.; Penson Financial Services, Inc.; Empire Financial Group, Inc.; Advantage Correspondent Clearing; Equitrade Securities Corporation; M.H. Meyerson & Co., Inc.; Charles, Schwab & Co., Inc.; Schwab Capital Markets, LP; Computer Clearing Services, Inc.; E*Trade Securities, Inc.; Ladenburg Thalmann & Company, Inc.; Ladenburg Capital Management, Inc.; GVR Company LLC; Investec Ernst & Company TD Waterhouse Investor Services, Inc.; National Investor Services Corp; Vfinance Investments, Inc.; U.S. Bancorp Piper Jaffray Inc.; Raymond James & Associates, Inc.; Taglich Brothers, Inc.; Robert W. Baird & Co., Inc.; Yorkton Securities, Inc. (now know as Orion Securities, Inc.); Morgan Keegan & Company, Inc.; Sterne, Agee & Leach, Inc.; Knight Securities, L.P.; Fiserv Securities, Inc.; Public Securities, Inc.; City Securities Corporation; ABN AMRO Securities, L.L.C.; BMO Nesbitt Burns Inc.; J.J. B. Hilliard, W.L. Lyons, Inc.; Phillip Louis Trading, Inc.; Newbridge Securities Corporation; and WM. V. Frankel & Co., Inc.